## THE BAR ASSOCIATION OF BALTIMORE CITY *v.* CARRUTH

[Misc. Docket (Subtitle BV) No. 2, September Term, 1973.]

*Decided May 31, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Robert M. Bell* for petitioner.

*Charles P. Howard, Jr.,* for respondent.

MURPHY, C. J., delivered the opinion of the Court.

By a disciplinary petition filed on March 15, 1973, pursuant to the provisions of Maryland Code (1968 Repl. Vol.) Art. 10, § 13 and Maryland Rule BV3, the Bar Association of Baltimore City charged William Carruth, a member of the Maryland Bar since 1959, with professional misconduct, malpractice and conduct prejudicial to the administration of justice. In substance, it was charged that in 1967 Carruth settled a client's personal injury claim with an insurance company for $750 without her knowledge or approval, forged the client's signature on the settlement check, commingled the proceeds of the check with his own funds, and used the proceeds for his own purposes without ever accounting to his client.

We ordered that the proceedings be transmitted to the Supreme Bench of Baltimore City for a hearing (Rule BV3 b) and designated Judges Solomon Liss, Basil A. Thomas and Robert B. Watts as the panel of judges to conduct the hearing (Rule BV4) and make a recommendation to us as to the proper disposition of the charges. Following an evidentiary hearing held on December 10, 1973, the three-judge panel concluded that Carruth was guilty of professional misconduct; it summarized the evidence adduced before it as follows:

"The controversy arises out of an accident involving one

Patricia Ford (now Patricia Wilson but hereinafter referred to as Mrs. Ford), when the cab in which she was a passenger was struck by another automobile. The day after the accident, Mrs. Wilson employed Mr. Carruth to represent her in a claim for personal injuries and consulted a Dr. Bradshaw Higgins. On or about April 6, 1967, the insurance carrier sent Mr. Carruth a check in the amount of $750.00, made payable to Patricia Ford and William Carruth, her attorney, in full settlement of all claims arising out of the accident of January 6, 1967. The facts of the matter to this point are not in dispute. From this point, however, they are hotly disputed.

"Mrs. Ford, at the hearing, denied ever having been informed that her case was settled until 1971, when she employed another attorney to investigate what had become of her claim. She denied ever having seen the check, denied authorizing settlement, denied receiving any of the proceeds, and insisted that she had never received an accounting from Mr. Carruth. She denied signing a power of attorney for Mr. Carruth and contended that she called him a number of times in 1967 and 1968 but was unable to get any information concerning her case. She also denied ever having given Mr. Carruth permission to endorse her name on the settlement check.

"Mr. Carruth, in his testimony, contended that Mrs. Ford signed a power of attorney which gave him 'authority to execute any and all documents as Attorney in Fact for the purpose of recovering damages for personal injuries and property damage' and which also provided that in consideration of the services rendered, Mrs. Ford was to pay $33^1/_3\%$ of all sums recovered if settled prior to commencement of trial and 40% after commencement of trial. Mr. Carruth offered a blank form as a copy of the power of attorney allegedly signed by Mrs. Ford but was unable to produce the actual form signed by Mrs. Ford because, he stated, the file was lost in the removal of his offices to a new location. Mr. Carruth further testified that he notified Mrs. Ford that her case was settled on April 5, 1967, and that her response was, 'Sign my name, and you

know what to do'. He also contended that he had represented Mrs. Ford in several other matters, beginning in 1965, but had never been paid for his services. These services included handling another accident case involving a traffic court appearance and negotiating partial payment arrangements with Mrs. Ford's creditors. He stated that he told Mrs. Ford, 'You won't get anything out of this because of all the work I have done before for you'. He admitted that he had never billed Mrs. Ford for services rendered and never had sent her an accounting of the monies received and the distribution of the funds. Mr. Carruth said he received a communication in May of 1972 from Deputy State's Attorney Benjamin Brown and had a conference with him, after which he delivered to Mr. Brown the full sum of $750.00. Thereafter, he stated, the money was delivered to Mr. Charles P. Howard, Jr., counsel for Mr. Carruth, who now has the funds pending the outcome of this proceeding.

"Mr. Carruth contended that he believed that the power of attorney, allegedly executed by Mrs. Ford, authorized him to endorse the settlement check. Counsel for the Bar Association called his attention to the fact that the two signatures on the check were written with two different pens and were apparently not in the same handwriting. Mr. Carruth explained this as being the result of 'doodling' when he wrote Mrs. Ford's signature on the check."

Carruth's testimony with respect to his "doodling" requires elaboration and close scrutiny. The colloquy, which developed on Carruth's cross-examination, went as follows:

"Q. I show you a copy of the check that is introduced into evidence and I show you two signatures on that check?

"A. Yes, I can explain that. I can explain why the two signatures are on there.

"Q. I mean what I wanted to get at is why are the two signatures different?

"A. Yes, I can explain that. During the time the check was in my office on Pennsylvania Avenue,

somebody came in the office. I was doodling and somebody came into the office and I was sitting there doodling.

"JUDGE WATTS: Doing what?

"A. Doodling.

"JUDGE WATTS: Doodling?

"A. Doodling and this is how this came about.

"JUDGE LISS: I don't understand what you mean what came about?

"A. The two different signatures. In other words, every now and then on Pennsylvania Avenue, somebody would come in and we would kibitz and play awhile for one or two minutes. Somebody came in. I don't know who it was. We were laughing about some things and I was doodling on a pad —

"JUDGE LISS: Well, if you were doodling on a pad, how would that signature get on that check?

"A. The check was there. I had the check on the pad and I started doodling and we were talking about some things and playing and that is why it happened like that. Normally, I wouldn't sign it.

"JUDGE LISS: Well, you had to sign it, didn't you, in order to get the —

"A. She instructed me to sign it, yes, yes.

"JUDGE LISS: Are you telling us that you were doodling and you signed her name?

"A. Yes, but he asked me why was it two different signatures and that is why."

\* \* \*

"Q. Mr. Carruth, isn't it also a fact that the two signatures are in different pens?

"A. Yes.

"Q. Could you explain to the court why the two signatures are in different pens?

"A. Because at the time I always carried — I always kept a couple of pens like I do now one black and one blue. I was playing there and this was on the desk. There is really no definite reason for it. Just whatever pen I picked up that is the one I used.

"JUDGE THOMAS: The ink on one appears to be blue and one appears to be black.

"A. Yes, I think there was a time lapse as we usually did have on the avenue.

"JUDGE LISS: Why would you be playing with a check? I don't understand that.

"A. No, the individual who came into the office was very jolly. This is how I got involved with the horseplay. That is how I got involved.

"JUDGE LISS: And in the course of horseplay you signed the name on the check?

"A. No, I was in the process of doodling then and we got to talking and playing and I wasn't paying much attention to what I was doing."

In concluding that there was clear and convincing evidence that Carruth was guilty of professional misconduct, the three-judge panel made these findings:

"We have considered carefully the conflicts in the testimony of Mrs. Ford and Mr. Carruth, and we come to the conclusion that the testimony of Mrs. Ford is the more accurate of the two. We accept her statements that she did not know her case had been settled until 1971, when she employed other counsel to determine what had happened in her case; that she never authorized the settlement made in the matter; that she never authorized Mr. Carruth to endorse her name on the release and the check; and that she never received any accounting of the funds. We further find that the language of the power of attorney if it existed, allegedly signed by Mrs. Ford did not authorize Mr. Carruth to sign the release and/or to endorse the settlement draft. It is clear that the respondent commingled with his own funds the funds belonging to Mrs. Ford. There is clear and

convincing evidence that the respondent violated Canon 1 DR 1-102 (A) (3) and (4); and Canon 9 DR 9-102 (A) and (B)(4) of the Code of Professional Responsibility. Canon 1, Section DR1-102 (Misconduct) provides:

' (A) A lawyer shall not:

* * *

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation.'

"Canon 9, Section DR9-102 (Preserving Identity of Funds and Property of a Client) provides:

' (A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows: (exceptions not pertinent)

* * *

' (B) A lawyer shall:

* * *

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.'

"We find as a fact that respondent is guilty of professional misconduct under the Canons cited." [1]

---

1. The Bar Association's disciplinary petition alleged specific violations of the Canons of Professional Ethics, as adopted by the American Bar Association and the Maryland State Bar Association; these Canons were in force at the time Carruth was alleged to have committed the acts in question. We adopted the American Bar Association's Code of Professional Responsibility effective November 2, 1970. See Maryland Rule 1230. Canon 1 DR 1-102 (A) (3) and (4) and Canon 9 DR 9-102 (A) and (B)(4) of that Code, which the three-judge panel found Carruth had violated, had their antecedents in the earlier Canons.

Based on our independent, detailed review of the complete record in this case, we conclude that the factual findings of the three-judge panel, including its resolution of the conflict in the testimony between Carruth and Mrs. Wilson, were amply supported by clear and convincing evidence; indeed, no other conclusion would appear to have been reasonably possible. In *Bar Association of Baltimore City v. Marshall*, 269 Md. 510, 518, 307 A. 2d 677 (1973), we made it clear that "when a practitioner, through his actions, demonstrates a failure to maintain the high moral standards of the profession, by dishonestly appropriating his client's funds to his own use, we should not hesitate to withdraw the privilege of membership in the legal fraternity of this State." We said at 519:

> "It has been immemorially acknowledged that at the very heart of the attorney-client relationship is the trust concept with the attorney acting as a trustee for his client in all of his undertakings for him. This is especially true in the attorney's handling of moneys of others coming into his hands. So, it is essential that all members of the legal fraternity be strongly and constantly impressed with the truism that in handling moneys and properties belonging to their clients or others that they accept them in trust and are strictly accountable for their conduct in administering that trust, so they dare not appropriate those funds and properties for their personal use. *The misappropriation by an attorney of funds of others entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct....*" (Emphasis supplied.)

We concluded in *Marshall* by saying "that when a member of the bar of this Court is found to have betrayed the high trust imposed in him by appropriating to his own use funds of others entrusted to him ... then, absent the most compelling extenuating circumstances ... disbarment should follow as a matter of course." 269 Md. at 520.

The three-judge panel, recognizing the force of the *Marshall* holding, said that it had "no alternative" other than to recommend Carruth's disbarment. It said, however, that, except for *Marshall*, it would have recommended a long period of suspension, suggesting the existence of these extenuating circumstances: (1) that Carruth had performed services for Mrs. Wilson in connection with other legal matters and had never been paid; (2) that as soon as Mrs. Wilson complained to the Grievance Committee of the Bar Association, concerning Carruth's handling of her personal injury claim, he tendered $750 to the Deputy State's Attorney of Baltimore City for payment to Mrs. Wilson, and these funds are now being held by Carruth's lawyer for delivery to Mrs. Wilson, pending the outcome of this matter; and (3) that no other violations or grievances have ever been filed or charged against Carruth in the fourteen years of his practice.

We see no compelling extenuating circumstances in this case which would justify the imposition of a sanction less than disbarment. The fact that after Carruth's defalcation had been discovered by others he offered to pay the misappropriated funds to his client warrants little in the way of commendation. The fact that Carruth had performed other legal services for Mrs. Wilson, for which he had never been paid, would hardly justify resort to the drastic "self-help" method which Carruth employed — forging his client's name to the settlement check and never accounting to her for the disposition of the proceeds. We view this as a gross and flagrant case of a lawyer's misappropriation of his client's funds for which disbarment, and only disbarment, is the appropriate sanction. *See Maryland State Bar Association v. Agnew*, 271 Md. 543, 318 A. 2d 811 (1974). Accordingly, the name of the respondent, William Carruth, will be stricken from the rolls of those authorized to practice law in this State.

*It is so ordered.*