532 A.2d 157

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Herbert Louis SINGLETON, Jr.

Misc. Docket (Subtitle BV) No. 39,
Sept. Term, 1986.

Court of Appeals of Maryland.

Oct. 28, 1987.

Melvin Hirshman, Bar Counsel, and Glenn M. Grossman, Asst. Bar Counsel for the Attorney Grievance Commission of Maryland, for petitioner.

Herbert Louis Singleton, Jr., Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Herbert Louis Singleton, Jr., alleging violations of the disciplinary rules of the Code of Professional Responsibility. We referred the matter, pursuant to Maryland Rule BV9 b, to Judge Thomas Ward of the Circuit Court for Baltimore City to make findings of fact and conclusions of law. After conducting a hearing upon an agreed statement of facts, Judge Ward filed detailed findings and conclusions as follows:

"A first and only charge of misconduct against the Respondent, Herbert Louis Singleton, Jr., arises out of the complaint of the Estate of Dr. Julius Wichner brought on behalf of his wife and sole heir, Edith Wichner, who is also the Personal Representative of the Estate of her husband.

"The facts are agreed between the Petitioner and the Respondent, and only their interpretation remains in question.

"These facts show that the Respondent, Herbert Louis Singleton, Jr., was a partner in a law firm of Singleton, Dashiell and Robinson, P.A. from January 1, 1981 through August 28, 1984, and practiced law at 4 East Fayette Street, Baltimore, Maryland 21202, during that period. A law escrow account in the name of the firm was maintained at the Union Trust Company, Account No. 206–09863, in which account were placed the escrow funds on behalf of the firm representing monies held for payment of bills, particularly medical bills owing to Dr. Julius Wichner for treatment performed by Dr. Wichner on behalf of various clients of the Respondent during the period in question. It has been admitted by the Respondent that on behalf of his following clients, money was received and collected on behalf of the claims brought by the Respondent on behalf of his clients, and that the money was either disbursed or not disbursed to Dr. Wichner in accordance with the following schedule.

| Client | Date Respondent recd. funds | Date Dr. Wichner was paid | Amount paid or owing |
|---|---|---|---|
| The Wood Family | Aug. 1980 | April, 1985 | $1,154.00 paid in April, 1985 |
| Carolyn Davis | Feb. 1980 | Aug., 1984 | $296.00 paid in August, 1984 |
| Doris Harper | Oct. 1980 | Aug., 1984 | $482.00 paid in August, 1984 |
| Nathaniel Randall | April 1981 | Feb. 24, 1983 | $108.00 paid on Feb. 24, 1983 |
| Forrestine Eubanks | Sept., 1980 | Never | $442.00 unpaid |
| Gregory Turnipseed | March 1981 | Never | $244.00 still owing |

"The Respondent agreed to remit to Dr. Wichner the fees owed him upon settlement of his clients' claims from funds which he received on behalf of his clients.

"The facts show that Mrs. Wichner examined the various accounts of her deceased husband and wrote a letter to the Respondent asking for an accounting on behalf of the various patients on behalf of whom Dr. Wichner performed services and had not been paid by the Respondent, who had contracted to pay the medical bills of his clients. She received no response. Mrs. Wichner then filed a complaint with the Attorney Grievance Commission of Maryland. The Attorney Grievance Commission of Maryland contacted the Respondent with respect to this complaint.

"On the 15th of August, 1984, the Respondent wrote to Mr. Grossman, attorney for the Attorney Grievance Commission of Maryland, acknowledging he was in receipt of his letter regarding the complaint of Edith Wichner, and that an initial examination of his list of clients and a check of his records showed that most of his accounts had been paid directly to Dr. Wichner. However, Mr. Singleton acknowledged that he would pull his closed files and financial reports and would forward to Mrs. Wichner a complete status report within the next five (5) days. On August 28, 1984, Mr. Singleton wrote to Mrs. Wichner a report which is attached to the Admissions filed in this case (Admission No. 12) and which is attached to this factual report as Court

**4**

Exhibit 1. Mr. Singleton reports in the said letter that the 'remaining twenty (20) accounts are being reviewed.' He stated that he would submit detailed information under 'separate cover', and that he was attempting to locate 'inactive files.'

"With respect to the violation of Disciplinary Rule No. 5–103, charging the Respondent with avoiding acquisition of interest in litigation, the Petitioner admits that the only evidence to support this charge is ledger sheet Exhibit 6 attached to the Petitioner's Admissions, but attached to the Court's Finding of Facts as Court Exhibit No. 2, which indicates that with respect to Nathaniel Randall there was a $100.00 disbursement on May 8, 1981, which is unexplained. Petitioner argues there is presumption that this is a loan, but there is no evidence in the record to indicate what the $100.00 amount was advanced for.

"Rule 9–102 charges the Respondent with preserving identity of funds and property of a client.

"The records are clear that the Respondent and his firm maintained an escrow account in the Union Trust Company during the accounting period in question under Account No. 206–09863. Petitioner's Exhibits attached to Admissions Nos. 14–20 present this Court with photostatic copies of bank statements of the account indicating that the opening balance on Petitioner's Exhibit No. 14 was $27,844.57, with a closing balance of $17,331.80. Other closing balances included approximately $29,000.00, $25,000.00, $27,000.00, $24,000.00, $14,000.00 and finally $25,000.00.

"But, the evidence also showed that in May of 1984, while the opening balance for the month in question was $3677.26, and the closing balance was $32,634.31, on May 4, 1984, the Respondent's escrow balance fell to $1,967.88, which apparently represents a low for the entire period in question as shown by Petitioner's Exhibits 14–20 attached to Admissions. The closing balance for the same month in question was $32,634.31.

"The Petitioner relies on Admission No. 79, which states 'You converted to your own business or personal use some or all of the funds of your clients, Deanna, Monica and Natalie Wood, Nathaniel Randall, Carolyn Davis, Doris Harper, Forrestine Eubanks and Gregory Turnipseed, which funds were to be maintained in your escrow account for the purpose of paying the medical bills of your clients.' The Petitioner further informed the Court that a mathematical analysis of the sums of money owing and unpaid by the Respondent for medical bills or whatever, while admittedly possibly incomplete, never rose above the amounts of money held by the Respondent in his escrow account for his firm, including the May 4th balance of 1984. This balance still exceeded the amount of owed monies by a small amount of money not revealed to the Court.

"In addition to the above evidence, it was also either testified to and/or presented through Admissions that there were the following amounts of money in the escrow account which had not been distributed to deserving clients: The Wood Family—$73.00; Gregory Turnipseed—$57.00; Nathaniel Randall—$185.00 (the transcript of testimony of the proceedings before the Attorney Grievance Commission on April 8, 1986, admitted into evidence as Exhibit No. 21 attached to the Admissions of the Petitioner, indicated that the sum was $200.00, a figure which Bar Counsel states is incorrect and should have been $185.00. While the $185.00 sum is not in evidence, this Court has accepted Bar Counsel's correction as evidence). See Admission No. 66.

"The Respondent, however, in replying to the charge of an infraction of Rule 9–102, denied failing to preserve the identity of funds, and testified to the Court that his escrow balance was always greater than any monies owing. When asked about Admission No. 79, the Respondent told the Court that he 'didn't read the Admissions', and that he had been at home suffering from various medical illnesses, and that he had just picked up his file on the way to court. Being pressed by the Court for further clarification of this surprising testimony, the Respondent admitted he may have

read them on the first day when he received the papers, but hadn't looked at them since. There is also evidence that there were more sums held in the escrow account belonging to clients that had not been distributed, apparently as a result of the Respondent's lack of clear accounting procedures. For example, a Mrs. Natalie Wood was owed approximately $73.00 resulting from her settlement of an accident claim which had not been distributed to her from the escrow account. The Respondent, however, stated that Mrs. Wood was employed in his office at the time that he handled her accident claim, and one of her duties was the maintaining and distribution of escrow funds. While he admitted neglect, he stated that there was no intention on either his part or Mrs. Wood's part to deprive her of her own money.

"The Respondent, in his testimony and argument, admitted to 'poor record keeping—extremely poor record keeping.' The Respondent stated that at the time in question he probably had three hundred or more cases active at the time of the death of Dr. Wichner. He further testified at the time of the inquiry by the attorney of the Estate of Dr. Wichner, he informed his office manager to pull the files and pay out any monies that were owed. He said he was personally more actively involved in the handling of criminal cases at the time, and the other members of his firm were charged with the responsibility of the remaining work. And, he further testified that during this same period of time there was a great deal of turnover in his law firm, not only with respect to attorneys coming and going, but also personnel, and even numerous changes of location of the offices of the firm itself.

"The Respondent further testified that at the time of the inquiry before the Disciplinary Panel, he was surprised to learn some cases had still not been paid. He also stated there were at least five or six files he still could not locate. He further stated he was willing to satisfy the outstanding claims, although he admitted that he had not done so at the time of the hearing of this cause of action, but promised to

do so within a short period of time. The Respondent admitted he should have been more directly involved in the management of the files and/or cases, and that until August, 1984, he had never taken a serious look at the escrow account. The Court's observation of the Respondent showed that the Respondent was apparently extremely contrite and freely admitted both in argument and in testimony his negligence.

"The medical report on behalf of Angela Brown, a client of the Respondent, was never filed with the Workmen's Compensation Commission. Mrs. Brown never made a complaint, and while it is not clear to this Court, apparently Mrs. Brown never showed up at her Workmen's Compensation hearing, and the case was dismissed. The medical bill was never paid.

"The medical bill of Ernest Coleman, a client of the Respondent, was never submitted to the insurance company. Dr. Wichner, whose bill it was, was never paid. See Admissions 67 through 78 with respect to Brown and Coleman.

## CHARGES

"The charges brought by the Attorney Grievance Commission for disciplinary infractions with respect to the complaint of Edith Wichner against Herbert Louis Singleton, Jr. were as follows:

Disciplinary Rule 1–102

"Misconduct.

(A) A lawyer shall not:

    (1) Violate a Disciplinary Rule.

    (3) Engage in illegal conduct involving moral turpitude.

    (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

    (5) Engage in conduct that is prejudicial to the administration of justice.

    (6) Engage in any other conduct that adversely reflects on his fitness to practice law."

Disciplinary Rule 5–103

"Avoiding Acquisition of Interest in Litigation.

(B) While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

Disciplinary Rule 6–101

"Failing to Act Competently.

(A) A lawyer shall not:

(3) Neglect a legal matter entrusted to him."

Disciplinary Rule 7–101

"Representing a Client Zealously.

(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objective of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which did not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

(3) Prejudice or damage his client during the course of the professional relationship, except as required under Dr 7–102(B)."

Disciplinary Rule 9–102

"Preserving Identity of Funds and Property of a Client.

(A) All funds of clients paid to a lawyer or a law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

Code of Professional Responsibility, Maryland Rule 1230, Annotated Code of Maryland and Article 10 Section 44, Annotated Code of Maryland.

## FINDINGS

### Complaint of Edith Wichner

"This Court finds as a fact that the Respondent, Herbert Louis Singleton, Jr., had an escrow account with the Union Trust Company of Maryland, which was established as a depository for trusts and/or escrow accounts for monies belonging to persons other than Mr. Singleton during the practice of law between the 1st of January, 1981 through

August 28, 1984. The facts further show during this period in question Mr. Singleton had deposited into his escrow account various funds received on behalf of the following clients listed below in a chart for the purpose of full payment of settlement agreements reached between Mr. Singleton on behalf of his clients. During this period of time the aforesaid chart shows the dates that the funds were received, the dates the money was distributed to Dr. Wichner, the deceased husband of the claimant, Edith Wichner, and the date that the medical bills were or were not paid to Dr. Wichner and/or Mrs. Wichner.

"All of the below accounts involve the allegation that medical bills had not been paid either to Dr. Wichner and/or his Estate or to Mrs. Wichner subsequent to the successful settlement of the claims of Mr. Singleton's clients listed below, at which time monies were obtained by Mr. Singleton for the purpose of paying these medical bills.

"The chart is as follows:

| Client | Date Respondent recd. funds | Date Dr. Wichner was paid | Amount paid or owing |
|---|---|---|---|
| The Wood Family | Aug. 1980 | April, 1985 | $1,154.00 paid in April, 1985 |
| Carolyn Davis | Feb. 1980 | Aug., 1984 | $296.00 paid in August, 1984 |
| Doris Harper | Oct. 1980 | Aug., 1984 | $482.00 paid in August, 1984 |
| Nathaniel Randall | April 1981 | Feb. 24, 1983 | $108.00 paid on Feb. 24, 1983 |
| Forrestine Eubanks | Sept., 1980 | Never | $442.00 unpaid |
| Gregory Turnipseed | March 1981 | Never | $244.00 still owing |

The evidence clearly shows that the Respondent agreed to remit to Dr. Wichner the fees owed him upon settlement of his (Singleton's) clients' claims from funds which he received on behalf of his clients. Despite a request for accounting by Mrs. Wichner, with respect to all of the above accounts and others, she received no response. After Mrs. Wichner filed a complaint with the Attorney Grievance Commission of Maryland, the Respondent responded both to

the Commission by letter dated the 15th of August, 1984, and by letter dated August 28, 1984, to Mrs. Wichner promising action. Despite this, it was not until April of 1985 that the Wood Family's account was satisfied with Mrs. Wichner, and the Forrestine Eubanks and Gregory Turnipseed accounts have never been satisfied and are still due and owing as of the time of the hearing of this cause of action. The Respondent admits to the accounts due and owing to Eubanks and Turnipseed at the time of the hearing of this cause of action, and promised to make prompt payment in the near future.

"This Court further finds that Court Exhibit No. 2 indicates that $100.00 was paid out of the escrow account of the Respondent to Nathaniel Randall on May 8, 1981, which is unexplained. There is no evidence in the record to indicate what the $100.00 payment was advanced for.

"The record further indicates that the escrow account of the Respondent contains the following sums of money due and owing to clients, which monies have never been distributed following the successful settlement of their claims. They are as follows: Wood—$73.00; Turnipseed—$57.00; Randall—$185.00.

"Apparently Mrs. Wood was employed by the Respondent at the time of the settlement and was charged with the office responsibility of handling the escrow accounts and making distributions. While there is no evidence of deliberate intent to deprive the clients of the monies that were due and owing under the contract of agreement between the Respondent and his clients, this Court finds as a fact that there is evidence of neglect and carelessness with respect to the management of the escrow account and the distribution of the remaining balances due and owing clients.

"The records clearly show that there were large balances maintained during the period in question in the escrow account maintained by the Respondent on behalf of himself and his law firm in the Union Trust Company, Account No. 206–09863, as represented by Petitioner's Exhibits Nos.

**12**

14–20. While the amount of balances indicated an opening balance in the first exhibit in the amount of $27,844.57, with a closing balance of $17,331.80, on May 4, 1984, the Respondent's escrow balance fell to $1,967.80, which represented a small sum of money in excess of the unpaid items known not to have been distributed by the Respondent to his clients and/or physicians in accordance with his agreements with clients and/or their physicians.

"The evidence discloses that the Petitioner relied on Admission No. 79, which states that the Respondent converted to his own business or personal use some of the funds belonging to his clients, which funds were gathered in his escrow account above referred to. Petitioner conducted no further interrogatorial investigation or other investigation into the exact status of the Respondent's escrow account, in view of the Respondent's Admission No. 79 above referred to. The Respondent, however, denied an imbalance, and blamed his failure to deny Admission No. 79 upon his startling admission that he had not reviewed the Petitioner's request for Admissions, and had apparently never read them except at the time that they were originally received.

"The Respondent himself either through testimony or through argument clearly acknowledged his poor record keeping, improper office management, failure to personally handle the cases in question, acknowledged that at least two of the owed medical charges had not been paid, in violation of the agreements with both Dr. Wichner and with his clients, and that he had never taken a serious look at the escrow accounts until after a complaint had been brought against him by the Commission.

"So, it is clear beyond any argument that the Respondent is guilty of Disciplinary Rule 1–102 "Misconduct. (A) A lawyer shall not: (1) Violate a Disciplinary Rule; (5) Engage in conduct that is prejudicial to the administration of justice; and (6) Engage in any other conduct that adversely reflects on his fitness to practice law." The large opening and closing balances of the Respondent's escrow accounts during the period in question clearly show that his failure to

pay his clients' bills did not result in any advantage to himself, and while the Respondent admits ineptitude, it is hard to find evidence showing dishonesty, fraud or deceit.

"Disciplinary Rule 5–103 charging the Respondent with 'Avoiding Acquisition of Interest in Litigation' is DISMISSED. Again, it seems to be the consensus of both the Petitioner and the Respondent that there is no evidence to show that the $100.00 loan paid out of the escrow account of Mr. Singleton to his client, Nathaniel Randall, on May 8, 1981, was for any improper purpose. There is only speculation as to what that amount was advanced for, and the Petitioner has failed to show by clear and convincing evidence that there was an illegal purpose.

"This Court finds that the Respondent has violated Disciplinary Rule 6–101, which charges the Respondent with "Failing to Act Competently.

(A) A lawyer shall not:

(3) Neglect a legal matter entrusted to him."

"Again, both the Respondent and Petitioner seem to agree that the facts have been sustained with respect to this charge. The failure of the Respondent even by the time of this hearing to make the payments to Mrs. Wichner which he was obligated to make and for which he had already collected funds, thereby subjecting his own clients to possible claims, clearly indicates a lack of competency with respect to the lack of the handling of his clients' cases.

"This, and much other evidence, indicates a lack of thoroughness and efficient management on the part of the Respondent with respect to the operation of his business.

"Therefore, this Court finds that the Petitioner has sustained clear and convincing evidence that the Respondent has violated Disciplinary Rule 7–101 reading as follows:

Disciplinary Rule 7–101

"Representing a Client Zealously.

(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by

law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which did not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

(3) Prejudice or damage his client during the course of the professional relationship, except as required under Dr 7–102(B)."

"Mr. Singleton's lack of zeal in protecting his clients' interests is clearly demonstrated by all of the facts above recited. The failure of the Respondent, who never claims insufficient funds to make the payments, to pay the open matters as of the date of the hearing before this Court is clear evidence that the Respondent continues to fail to represent his clients zealously right up to and including the date of the hearing. Respondent has promised this Court that these payments will be made within a short period of time.

"The request of the Petitioner for this Court to find that the Respondent has violated Disciplinary Rule 9–102 is more troublesome. There is no question that if this Court is willing to accept Admission No. 79 as indicative of the total evidence available to this Court as to whether or not Disciplinary Rule 9–102 has been violated, then this Court would be persuaded by clear and convincing evidence that the Petitioner has sustained its case. However, the evidence also indicates that the only evidence of any imbalance in the escrow account of the Respondent and his law firm occurred on May 4, 1984. However, inquiry showed that this was not an imbalance, and that, in fact, the escrow account

was in excess of any undistributed funds. The Petitioner argues that discovery stopped with the Respondent's Admission to Admission No. 79, which made further accounting procedures unnecessary. An examination of the Respondent's escrow account as represented by Petitioner's Exhibits 14–20 attached to Admissions indicates that the unusually low balance of May 4, 1984, was an exception, and that the escrow accounts contained monies far in excess of those apparently earmarked for distribution.

"This Court cannot say that it is clearly convinced that this Respondent failed to preserve the identity of funds and property of a client, and Disciplinary Rule 9–102 is DISMISSED.

"Therefore, this Court finds that the Petitioner has sustained the following charges:

Disciplinary Rule 1–102

"Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

Disciplinary Rule 6–102

"Failing to Act Competently.

(A) A lawyer shall not:

(3) Neglect a legal matter entrusted to him."

Disciplinary Rule 7–101

"Representing a Client Zealously.

(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which did not prejudice the rights of his client, by being punctual

in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B)."

"This Court finds that the Petitioner has failed to sustain the other charges brought against the Respondent, Herbert Louis Singleton, Jr."

Bar Counsel excepted only to Judge Ward's failure to find that Singleton violated DR 9–102(B)(3) and (4). As to these, Bar Counsel argues that, in view of Judge Ward's findings, Singleton neglected and was careless in the management of the escrow account and in the distribution of the remaining balances due and owing clients. Moreover, he points to Singleton's own admissions of poor record keeping and improper office management, and maintains that, as a result "appropriate accounts were not made to the Respondent's clients." And, further, Bar Counsel urges that Singleton's failure to pay his clients' medical bills with funds received on their behalf, as he had agreed to do, constitutes a violation of DR 9–102(B)(4).

We think Bar Counsel's exceptions are well taken and will be sustained. *See Attorney Griev. Comm'n v. Morehead,* 306 Md. 808, 511 A.2d 520 (1986); *Attorney Griev. Comm'n v. Velasquez,* 301 Md. 450, 483 A.2d 354 (1984).

Bar Counsel has recommended that because of Singleton's misconduct in this case, and of his prior disciplinary record, disbarment is the appropriate sanction in this case. He draws attention to Judge Ward's finding that Respondent failed to properly administer his clients' funds and did not monitor his escrow accounts until after the complaint had been filed against him in this case. Bar Counsel notes

that on January 30, 1986, in another case, we indefinitely suspended the Respondent from the practice of law for neglect and misrepresentation, with the condition, however, that he could apply for reinstatement 45 days thereafter. *See Attorney Griev. Comm'n v. Singleton,* 305 Md. 259, 503 A.2d 714 (1986). Bar Counsel also notes the existance of an earlier private reprimand on July 8, 1982, for similar misconduct involving a time period corresponding to that in the present case.

Singleton did not take exception to any of Judge Ward's findings. He did, however, appear before us at oral argument in this case. He asserted that at the time of his misconduct, as now, he was physically and mentally unable to practice law. It was because of this disability, he said, that he had not applied for reinstatement to the Bar following his earlier indefinite suspension.

According to Singleton, much of his difficulty resulted from his efforts to develop a successful law practice, which he began in 1975 with three other attorneys. He said that it was mainly through his efforts that the firm grew to nine lawyers by 1986. Earlier, he had acted as an attorney for the NAACP and for the Legal Aid Bureau. Singleton told the Court that he considered himself an attorney of last resort for many people, at times not even charging for his services. His partners therefore accused him of carrying over the "legal aid mentality" to his private practice. By the time of the present disciplinary action, Singleton's firm had dissolved.

In the process of trying to operate a successful law firm, and to help those who couldn't pay, Singleton claimed that he neglected his health to the point that his judgment was poor and his physical state was "grossly poor." He characterized himself as living on the "fast track," as being "in a state of continuous motion," and as having to put out fires 24 hours a day. He was "burnt out, run down," both physically and mentally. In fact, he said that his suspension may have even saved his life by forcing him to sit down and take account of what his life had become.

Singleton told us that he suffered from a number of medical problems, including glaucoma which had blinded him in one eye. Further, he said that he suffered from a cardiovascular problem and is on medication for high blood pressure (with a number of bad side effects). Additionally, he said he suffers from a condition stemming from a sickle cell trait. He said also that he had been told to have all of his teeth removed, but due to his high blood pressure, this could not be done all at once. He said he also suffered from excruciating headaches.

Due to these health problems, Singleton said that until eight months ago he could not even leave his house; consequently, he stayed locked up in his room feeling sorry for himself. He simply "gave up", he said, and did not seek help from others. This was, in some part, because he didn't realize how bad off he really was and because of his "foolish pride."

Presently, Singleton said that he is under the care of several medical doctors. The medication he now uses controls his blood pressure but he is still unsure about his overall health prognosis. As to his emotional problems, Singleton did not think that treatment was necessary, although he said that he made an initial inquiry which he did not pursue.

Singleton told the Court that he never has had an alcohol or drug problem. His problems, he said, stemmed from too much pressure, coupled with his medical problems.

Singleton attributed part of his problems with the escrow account to the system used at his law firm which permitted everyone access to this account. As managing partner, he felt he was more or less taking the full blame for the actions of others. Although he acknowledged that part of his responsibility as managing partner was to "do more than casually glance over the accounts," he claimed that he is just not given to detail, and has trouble balancing his own checkbook. He acknowledged that there were glaring discrepancies on the ledger sheets (i.e., notations that checks

were deposited when in fact they were not), but he said that he never previously noticed them. Additionally, he admitted that he never made any serious effort to reconcile the bank statements with the records in his office. He repeatedly stated that he never once deliberately or intentionally removed any funds from any clients' accounts for his own personal use. Additionally, he said that many of the clients' funds which he was accused of mishandling were not those of his clients, although as supervising attorney he was responsible for them. Moreover, he asserted that he was primarily a criminal trial lawyer and most of the claims originated from personal injury cases handled by others.

Singleton stated that when he received an inquiry from the estate of Dr. Wichner for outstanding monies due, he initially referred the matter to someone else in his office to investigate with instructions to pay what was due. He claimed that he did not consult with any representatives of the estate because he thought that the matter had been concluded and that nothing was owed.

No evidence appears in the record that Singleton's misconduct was in any way related to his physical or mental health. We note that all of Singleton's disciplinary infractions occurred within the same general time frame. We think the appropriate sanction in this case is an indefinite suspension, rather than disbarment. This sanction supersedes our earlier conditional indefinite suspension. *See, Attorney Griev. Comm'n v. Singleton, supra,* 305 Md. at 268, 503 A.2d 714.

IT IS SO ORDERED: RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST HERBERT LOUIS SINGLETON, JR.