593 A.2d 1087

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Gus BAKAS.**

**Misc. (Subtitle BV) No. 44, Sept. Term, 1989.**

Court of Appeals of Maryland.

Aug. 19, 1991.

John C. Broderick, Asst. Bar Counsel, for the Atty. Grievance Com'n of Maryland.

David P. King, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and BELL, JJ.

MURPHY, Chief Judge.

The Attorney Grievance Commission filed a petition for disciplinary action against Gus Bakas alleging violations of the Code of Professional Responsibility. Judge Leonard

Jacobson of the Circuit Court for Baltimore County, to whom the matter was referred pursuant to Maryland Rule BV9 b, determined that Bakas had violated DR 1–102(A)(1), (4), (5), and (6); DR 6–101(A)(3); DR 9–102(B)(3) and (4); and also Maryland Code (1987 Repl.Vol.), Article 10, § 44, prohibiting lawyers from commingling personal and client escrow funds.[1]

In his memorandum opinion, Judge Jacobson concluded from the evidence adduced at the hearing that Douglas Sandhofer was injured in an automobile accident on September 30, 1983 and retained Bakas to represent him; that on June 1, 1984, Bakas settled Sandhofer's claim against the other driver for $7,750; that he also processed and collected Personal Injury Protection (PIP) benefits from two insurers on Sandhofer's behalf, totalling $3,315.75; and that the total recovery of $11,065.75 was deposited into Bakas's escrow account on June 1, 1984. Judge Jacobson further

---

1. The disciplinary rules provide:
 "DR 1–102 Misconduct.
 "(A) A lawyer shall not:
 (1) Violate a Disciplinary Rule.
 \* \* \* \* \* \*
 (3) Engage in illegal conduct involving moral turpitude.
 (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
 (5) Engage in conduct that is prejudicial to the administration of justice.
 (6) Engage in any other conduct that adversely reflects on his fitness to practice law."
 "DR 6–101 Failing to Act Competently.
 "(A) A lawyer shall not:
 \* \* \* \* \* \*
 (3) Neglect a legal matter entrusted to him."
 "DR 9–102 Preserving Identity of Funds and Property of a Client.
 \* \* \* \* \* \*
 "(B) A lawyer shall:
 \* \* \* \* \* \*
 (3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
 (4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

found that on June 23, 1984, Bakas paid $6,742.25 to Sandhofer by check drawn upon his escrow account and that on November 6, 1984, Bakas paid $849.84 to Sandhofer by check drawn on his escrow account, for a total of $7,592.09.

Judge Jacobson determined from the evidence that between June 23, 1984 and November 6, 1984, Bakas drew checks against his escrow account for his own personal and professional benefit, and that during this period the balance of his escrow account fell below the balance which represented funds due to Sandhofer. The evidence further disclosed that Sandhofer was subsequently sued for unpaid medical bills related to the 1983 automobile accident, which should have been paid by Bakas.

Sandhofer filed a complaint against Bakas with the Attorney Grievance Commission. In the course of the ensuing investigation, Bakas advised the Commission, by letter dated June 23, 1986, that he had recovered $13,245.75 for Sandhofer; later, however, at the disciplinary hearing, Bakas claimed that he could not recall precisely how much he had recovered and that he had no supporting documentation concerning the matter.

Judge Jacobson found that the representation made to the Commission on June 23, 1986 was incorrect and that Bakas only recovered $11,065.75 on Sandhofer's behalf. He determined that Bakas had never provided an accounting of the funds received by him for Sandhofer and that he unlawfully commingled his personal funds with client funds in his escrow account between March 1984 and June 1986.

While noting that Bakas testified concerning his alcoholism during the period in question in an effort to mitigate his misconduct, Judge Jacobson made no finding of fact as to the existence of any causal relationship between the misconduct and the alleged alcoholism.

In an unreported opinion dated November 7, 1990, we remanded the matter to Judge Jacobson to determine whether there was a causal relationship between Bakas's misconduct and his alcoholism, as Bakas had maintained.

In his supplemental findings, Judge Jacobson said that he had reviewed the entire record in the case and found no such causal relationship. He explained:

"While the Petitioner's case before this Court consisted entirely of five exhibits, the last of which was a transcript of the Respondent's client, the Complainant, before the Inquiry Panel, the Respondent's case consisted primarily of a recitation of the Respondent's personal and professional history, a report of a psychiatric evaluation and the testimony of Richard Vincent, an expert on alcoholism, who counseled the Respondent and got him into therapy while these proceedings were pending.

"Although the Petitioner's testimony and that of Mr. Vincent, as well as the report of Dr. McDaniel, present a picture of a life style of nearly 40 years dominated by the use and apparent abuse of alcohol, there is little or no direct evidence that such a life style and its predictable consequences caused the Respondent to act in the manner described in this case. The Respondent apparently handled the Complainant's case in a manner which the Complainant found to be satisfactory. The Complainant received the funds to which he was entitled and complained only of the Respondent's failure to pay his doctor's bill out of the proceeds of the settlement. Subsequent investigation conducted by the Commission revealed that in the course of processing the proceeds of the three settlements which the Respondent made on behalf of the Complainant, Respondent's escrow account fell below the balance which represented funds owed to his client. It also disclosed that the Respondent commingled his personal funds with his client's funds in his escrow account. Respondent's own testimony revealed that a $10,000.00 deposit to his escrow account, which he borrowed from relatives for the purposes of funding a settlement with his wife in his divorce case, was deposited in that account to avoid attachment by the Internal Revenue Service. Respondent attempts to explain the lack of any documentary support for his version of the handling of his client's

case by stating that his file was misplaced or lost when he was having some paint work done around his house."

Upon these factual findings, Judge Jacobson applied the "clear and convincing" evidence standard in determining whether Bakas's misconduct was causally related to alcoholism. He said:

"[T]his Court is unable to find that the misconduct ... was causally related to the Respondent's alcoholism. Although the Court concludes that the Respondent is, indeed, an alcoholic, he was described by his own witness, Mr. Vincent, as a maintenance alcoholic, one who is able to function. Mr. Vincent testified that '... the only way you find out (that the person is an alcoholic) is that something physical happens to them, such as cirrhosis, heart problem, heart attack.' The Respondent was able to handle a routine personal injury case and achieve an acceptable settlement. He was able to process two personal injury protection insurance claims and receive the correct payments from both insurers. He was able to make a nearly appropriate distribution to the client of 68% of the total proceeds (a usual one-third contingent fee would have yielded $215.66 less to the client, recognizing, however, that the application of the contingency to the PIP recovery was improper). The Respondent recalls having a file in this matter, even though he claims to have lost it. The Respondent recalls protecting his own funds from Internal Revenue levy by concealing them in his escrow account. This Court can only conclude that these acts were done knowingly and that the alcoholism from which the Respondent suffers, under the facts of this case, does not constitute a mitigating circumstance bearing on the sanction to be imposed."

After concluding that Judge Jacobson improperly applied the clear and convincing evidence standard of Maryland Rule BV10 d in determining whether Bakas had proved the causal relationship between his misconduct and his alcoholism, we again remanded the case for further consideration. We said that the clear and convincing standard did not

apply to factual matters sought to be established in mitigation of his misconduct. We said that the preponderance of the evidence standard was the applicable measure of proof. *See Attorney Griev. Comm'n v. Bakas,* 322 Md. 603, 589 A.2d 52 (1991).

In his second supplemental findings of fact, Judge Jacobson determined that Bakas had not proved, by a preponderance of the evidence, that his misconduct was causally related to his alcoholism. Bakas took exception to this finding, claiming that it was entirely unsupported by the record and was, therefore, clearly erroneous. He contended that all of the evidence supported the conclusion of the requisite causal relationship, and he relied upon the report of Dr. Ellen McDaniel, an expert psychiatrist employed by the Commission, that Bakas's alcoholism "was the cause of the misconduct in the Sandhofer case." Additionally, Bakas points to his own testimony confirming the existence of his alcoholism and its causal relationship to his misconduct. He also refers to the testimony of Richard Vincent, Director of the Lawyer Counseling Service of the Maryland State Bar Association, delineating the characteristics of the disease of alcoholism, and how it impacts upon the ability of a lawyer in the decision-making process to organize files and to keep and communicate with clients.

While Dr. McDaniel did not testify, her report was received in evidence. It stated that she saw Bakas on May 2, 1990 for 2½ hours at the request of the Commission. Her report related Bakas's long history of drinking as told to her by Bakas. She concluded that he was an alcoholic. She pointed out that Bakas understood the nature of the complaint against him; that he began attending meetings of Alcoholics Anonymous in December of 1988; and that one of Bakas's long-time friends described him as a heavy drinker who would "forget things ..., leave things ..., give excuses to avoid pressure" and would take payment for legal services rendered in alcoholic beverages. By way of summary, Dr. McDaniel stated in her report:

"From the information presently available, it is my opinion that Mr. Constantino Bakas does suffer from a mental disorder, i.e., alcoholism. He has a past history of alcohol abuse, dependence, and intoxication. This history of heavy drinking dates back to the early 1970s and lasted until December, 1988.

"It is my opinion that Mr. Bakas's alcoholism was the cause of the misconduct in the Sandhofer case. The misconduct appears to be secondary to the abnormal mental state that Mr. Bakas had while intoxicated. The misconduct does not appear to be self-serving or well-planned but rather the result of confused, unfocused thinking.

"I have some concerns about Mr. Bakas's future. Mr. Bakas's attendance at AA has decreased to a minimum. He did not appear to be comfortable identifying himself as an alcoholic when confronted by a bartender. He views the deterioration in client referrals as secondary to his being sober, rather than the result of years of drunkenness. He feels significant pressure from the Attorney Grievance Commission and from the Internal Revenue Service. He has no close family ties and professionally seems to be isolated. His memory for dates is spotty, and he is somewhat vague in describing emotionally conflictual topics (e.g. his marriage and his relationship to his daughter, his legal problems over the years, his law practice). There is no evidence of any psychotic process. I recommend additional testing by a neurologist and a neuropsychologist if one wants to clarity any questions about a subtle dementia secondary to chronic alcohol abuse."

▆▆▆▆ Judge Jacobson's findings of fact are prima facie correct and will not be disturbed on review unless clearly erroneous, giving due regard to his opportunity to assess the credibility of the witness. *See Attorney Griev. Comm'n v. Winters*, 309 Md. 658, 665, 526 A.2d 55 (1987); *Attorney Griev. Comm'n v. Collins*, 295 Md. 532, 548, 457 A.2d 1134 (1983); *Attorney Griev. Comm'n v. Kahn*, 290

Md. 654, 678, 431 A.2d 1336 (1981). Manifestly, Judge Jacobson did not accept the conclusion of Dr. McDaniel's report of a causal relationship between Bakas's alcoholism and his misconduct. He indicated, we think correctly, that the report contained little detail or substance to support her opinion. Thus, we cannot say that Judge Jacobson was clearly erroneous in determining that the substantial or precipitating cause of Bakas's misconduct was not his alcoholism. Of course, the trier of fact may disregard the report or testimony of an expert witness in attorney disciplinary cases if deemed not to be credible. *See Attorney Griev. Comm'n v. Powers,* 314 Md. 484, 551 A.2d 465 (1989); *Attorney Griev. Comm'n v. Ezrin,* 312 Md. 603, 541 A.2d 966 (1988); *Attorney Griev. Comm'n v. Winters, supra; Attorney Griev. Comm'n v. Nothstein,* 300 Md. 667, 480 A.2d 807 (1984). In this regard, Judge Jacobson evaluated Dr. McDaniel's report in light of the evidence showing that Bakas functioned as a maintenance alcoholic without incident for a number of years in the practice of law; that he had the presence of mind to secrete $10,000 in his escrow account to avoid attachment by the IRS; and that he successfully handled all aspects of Sandhofer's case, including partial disbursement of the funds received on his behalf. *See, e.g., Nothstein, supra,* 300 Md. at 686, 480 A.2d 807, according evidentiary significance to the fact that a lawyer, who claimed that his misconduct was the result of mental illness, carried on a successful law practice for a substantial period during the time of his misconduct and *Winters, supra,* 309 Md. at 667, 526 A.2d 55, noting that the attorney, who claimed his misconduct was causally related to his drug addition, maintained a law practice without any adverse effect on his clients.

 Misappropriation of funds by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction. *Ezrin, supra,* 312 Md. at 608–09, 541 A.2d 966. After consideration of all the circumstances, including the nature and gravity of the

misappropriation, and the relatively short period during which Bakas's escrow account was in arrears, we think an indefinite suspension, rather than disbarment, is the appropriate sanction in this case.

IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST GUS BAKAS.

ROBERT M. BELL, Judge, concurring and dissenting, in which McAULIFFE and RODOWSKY, JJ., join.

I concur in the majority opinion insofar as it concludes that the trial judge was not clearly erroneous when he determined that alcoholism was not the "substantial or precipitating cause of Bakas's misconduct." I do not join the majority, however, in concluding that the appropriate sanction in this case is an indefinite suspension.

It is well settled, and this Court has consistently so held, see *Matter of Murray*, 316 Md. 303, 308, 558 A.2d 710, 712 (1989); *Attorney Griev. Comm'n v. Sparrow*, 314 Md. 421, 426–27, 550 A.2d 1150, 1152 (1988); *Attorney Griev. Comm'n v. Ezrin*, 312 Md. 603, 608–09, 541 A.2d 966, 969 (1988); *Attorney Griev. Comm'n v. Nothstein*, 300 Md. 667, 687, 480 A.2d 807, 817 (1984); *Attorney Griev. Comm'n v. Molovinsky*, 300 Md. 291, 296, 477 A.2d 1181, 1184 (1984); *Attorney Griev. Comm'n v. Pattison*, 292 Md. 599, 609, 441 A.2d 328, 333 (1982); *Attorney Griev. Comm'n v. Burka*, 292 Md. 221, 225, 438 A.2d 514, 517 (1981), that, in the words of the majority opinion, "[m]isappropriation of funds by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." Moreover, that there are compelling extenuating circumstances justifying a less onerous sanction than disbarment must be demonstrated by

the attorney, *Burka*, 292 Md. at 225, 438 A.2d at 517, which demonstration must be by a preponderance of the evidence. *Attorney Griev. Comm'n v. Bakas*, 322 Md. 603, 605, 589 A.2d 52, 53 (1991). In *Ezrin*, we rejected a respondent's "general good character, . . . excellent reputation as a lawyer, lack of prior misconduct, . . . restitution of the stolen funds, and . . . cooperation with the authorities" as compelling extenuating circumstances. *Id.*, 312 Md. at 609, 541 A.2d at 969. And, we have held, "only mitigating factors present at the time of the commission of the crime are relevant." *Molovinsky*, 300 Md. at 297, 477 A.2d at 1185. Thus, contrition and rehabilitative efforts, being acts occurring after the fact, are not extenuating circumstances. *Id. See also Attorney Griev. Comm'n v. Mandel*, 294 Md. 560, 588, 451 A.2d 910, 922 (1982).

The procedural posture of the case is significant. The only issue before the Court now is, as it always was, the appropriate sanction for respondent's misconduct. Our initial focus was on the causal relationship between respondent's alcoholism and his misconduct. On two separate occasions, we directed inquiries to the trial court on that issue and, on two occasions, the trial court responded that there was none. The focus thus shifted to whether there are other compelling extenuating circumstances justifying the lesser sanction.

Although, as the majority holds, the trial court was not clearly erroneous in finding no causal relationship between the respondent's misconduct and his alcoholism, this Court nevertheless also holds that there are compelling extenuating circumstances sufficient to justify a lesser sanction than disbarment, specifically, the "nature and gravity of the misappropriation, and the relatively short period during which Bakas's escrow account was in arrears." By so doing, the majority makes the usual sanction applicable only in the case of "serious" misappropriations and rather lengthy escrow account arrearages. We are not told what constitutes "serious" misappropriations or "relatively short

period[s]" of escrow account arrearages. Presumably, they must be determined on a case-by-case basis.

The rationale advanced by the majority fails to support the sanction imposed. Indeed, no cases are cited in support of the position. To be sure, we recently ordered an indefinite suspension in a case involving, *inter alia,* management of an escrow account. *Attorney Griev. Comm'n v. Singleton,* 311 Md. 1, 532 A.2d 157 (1987). In that case, the lawyer's honesty was not at issue, the hearing court having determined that "it is hard to find evidence showing dishonesty, fraud or deceit," 311 Md. at 13, 532 A.2d at 163; the only issue was that lawyer's ineptitude in managing the escrow account. 311 Md. at 16, 532 A.2d at 165.

A sanction other than disbarment was imposed in *Prince George's County Bar Association v. Vance,* 273 Md. 79, 327 A.2d 767 (1974). That case does not, however, support the majority's position. The lawyer's escrow account was not involved; rather, the issue was whether his act of forgery for the purpose of obtaining favorable prices at a branch office of the Bolling Field Post Exchange should result in his disbarment. Although recognizing that "respondent's acts were fruits of misrepresentation; moreover, they were studied, not impulsive," we elected to suspend him for 90 days rather than disbar him. Our decision was not based solely on the nature and gravity of the misconduct, however. There were other factors, including Vance's "genuine contrition" and "the obvious esteem in which respondent is viewed in his community."[1] 273 Md. at 84, 327 A.2d 767. *Vance* is to be contrasted with *Fellner v. Bar Ass'n,* 213 Md. 243, 131 A.2d 729 (1956). In *Fellner,* we disbarred a lawyer whose misconduct consisted of in-

---

1. The majority does not rely on *Vance,* perhaps because it feels that it was wrongly decided. Certainly, I think it was wrongly decided. The misconduct in *Vance,* while not resulting in significant gain for Vance, was designed to defraud the Post Exchange and, as the Court pointed out, was studied and deliberate. In my view, such conduct may not be excused simply because it did not produce lucrative returns.

serting slugs, rather than coins, in a parking meter in Baltimore City. Although the financial benefit to Fellner was *de minimis,* we noted (213 Md. at 247, 131 A.2d at 731):

> In the instant case, the offense committed by the appellant was not a casual or thoughtless one. The evidence supports the inference that he resorted to a deliberate and systematic practice of cheating the City by the use of slugs. Morally, the offense was as great as though he had stolen money deposited by others in the meters, and amounts at least to "fraud or deceit".

Our cases make clear that "[t]he misappropriation by an attorney of funds of others entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct." *Bar Ass'n v. Marshall,* 269 Md. 510, 519, 307 A.2d 677, 682 (1973). *See also Attorney Griev. Comm'n v. McBurney,* 283 Md. 628, 631, 392 A.2d 81, 82 (1978). When, as is the case with these proceedings, the issue is the protection of the public, not the punishment of the respondent, *McBurney,* 283 Md. at 631, 392 A.2d at 82, it is most inappropriate that the sanction be made to depend, as the majority does, on the "seriousness" of a misappropriation or the length of time the misconduct continued. As I see it, this is not what is meant by compelling extenuating circumstances.[2] *See Bar Ass'n of Balto. City v. Carruth,* 271 Md. 720, 728, 319 A.2d 532, 536 (1974).

Because in my view, the majority has not identified any *appropriate* compelling extenuating circumstance to justify the lesser sanction, I respectfully dissent.

---

**2.** Indeed, the seriousness of the misappropriation and its duration may not be mitigating at all. They may be simply indications that the misconduct was not so successful as it could have been or was discovered sooner than it might have been, that the scheme in which it manifested itself was not so complex or ingenious as it may have been, or even that the respondent was a petty, as opposed to a grand, thief.

**408**

Judges McAuliffe and Rodowsky have authorized me to state that they join in the views expressed herein.