593 A.2d 1103

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Stephen L. BERGER

Misc. (Subtitle BV) No. 38 Sept. Term, 1990.

Court of Appeals of Maryland.

Aug. 20, 1991.

Melvin Hirshman, Bar Counsel, and Walter D. Murphy, Jr., Deputy Bar Counsel, Annapolis, for the Attorney Grievance Com'n of Md., for petitioner.

Richard Rosenthal, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and KARWACKI, JJ.

RODOWSKY, Judge.

Stephen L. Berger (Berger), a member of the bar of this Court, conducts a plaintiffs' personal injury practice. In June 1984 Mrs. Nancy A. Bart retained Berger, and ultimately complained against him to Bar Counsel. The complaint reached the level of public charges which we referred for hearing to Judge Ellen M. Heller of the Circuit Court for Baltimore City.

Judge Heller found that Berger had violated the Maryland Lawyers' Rules of Professional Conduct: Rule 1.15, by mismanaging his escrow account; Rule 1.3, by failing to act diligently in the matter; and Rule 1.4, by failing promptly to reply to the client's reasonable requests for information. Berger does not except to these findings. Judge Heller further concluded that, "[n]otwithstanding these findings, the Court does not find that Mr. Berger's actions were taken with the intent to deceive or fraudulently deprive or misrepresent any client in any matter." Bar Counsel excepts, contending that Judge Heller should have found that Berger "knowingly misappropriated to his own use a substantial portion of Mrs. Bart's funds. . . ."

Bar Counsel's case rested on the bank statements of Berger's escrow account and on copies of the cancelled checks for that account, particularly for the period following Berger's receipt of Mrs. Bart's funds in August 1988 to the disbursement to her in February 1989. Because Bar Counsel knew only the amount of money which Berger held in trust for the complainant, Bar Counsel's case consisted of demonstrating that, in early November 1988, the escrow account was far below that minimum required balance. Judge Heller found that the November 1988 shortage was due to negligence. Certain primary fact-findings underlie that conclusion. Judge Heller said:

"It is significant that it was Mr. Berger who discovered the shortfall on November 10, 1988 and made efforts on his own part to bring the account into balance. The account was brought into balance by December, 1988, *prior* to Mrs. Bart's filing her complaint with the Com-

mission. Indeed, the account was brought into balance prior to Mr. Berger being notified by Mrs. Bart's attorney ... that she should receive the net proceeds of the settlement in February, 1989."

As we shall demonstrate, the significant ultimate fact-finding concerning Berger's state of mind was substantially predicated on a finding of primary fact which is erroneous. Because of that error, we shall remand for reconsideration.

Berger represented Mrs. Bart and her then husband, Alan Bart, concerning their claims arising out of a June 1984 accident in which Mrs. Bart suffered bodily injuries. There is a written fee agreement, signed by Mrs. Bart, providing for a fee of one-third of any and all sums received. Berger filed suit in February 1987, claiming, *inter alia,* for loss of consortium. The case was settled in June 1988 for $29,000 which was paid by an insurer's draft dated July 13, payable to Mr. and Mrs. Bart and to Berger, as their attorney.

By this time the Barts had separated, had individual counsel, and were seeking a divorce. The Barts, through their respective counsel, and Berger agreed that Berger would hold their funds in his escrow account pending agreement on disposition of the net proceeds. Berger deposited the draft on August 1 to his escrow account.

Berger did not take his agreed fee from the recovery when it was received. That was not his practice. Even if he had rendered an accounting and made a distribution to the Barts upon receipt of the recovery, he would not have drawn a check to himself on his escrow account for the entire fee to which he was entitled. Rather, it was Berger's practice to leave earned fees in the escrow account and to draw against those fees in increments, typically of $1,000 or $2,000.[1] For example, through the month of August 1988, Berger withdrew $15,250 from his escrow account by eight

---

1. The record does not reflect at what point Berger recorded the receipt of a fee in order to report it as part of his gross income for income tax purposes.

checks ranging in amount from $1,000 to $3,000. Only one of these eight checks bears a notation identifying the matter where the funds were earned.

If Berger maintained individual client ledgers for the Barts' account, or generally, they are not in evidence. The only evidence of any accounting "control" is Berger's testimony that he kept at his desk a tally sheet on which he recorded the fees earned that were in the escrow account. From these he subtracted the incremental withdrawals as made. He said that this system seemed feasible because only three or four cases would be in settlement at any one time. Berger testified that he discontinued this practice on the advice of his present counsel whom Berger engaged after Mrs. Bart complained to Bar Counsel in early May of 1989. Berger testified that he had thrown away the tally sheet which reflected his withdrawals from escrow against his fee on the Barts' matter. Any tally sheet which Berger might have been using in May 1989, at the time Bar Counsel notified Berger of the complaint, was no longer available to be introduced in evidence in this case as illustrative of the practice.

Berger's position is that he took the fee on the Bart matter in the form of six checks drawn on his escrow account between September 1 and October 5, 1988. Five of the checks were written in September and total $8,100. The cancelled checks do not identify their purpose on their face. Only two other checks were drawn on the escrow account payable to Berger during September 1988. These totaled $4,166.

Berger maintained only one escrow account. By the end of September he had made no disbursements out of the Barts' recovery other than for fee. If the Barts were Berger's only clients, Berger's escrow account at the end of September should have contained at least $20,900 ($29,000 less fee to that date of $8,100). On September 30 the escrow account balance was $14,838.48.

On October 5 Berger withdrew $2,500 from escrow which he identifies as the balance of the fee on the Barts' case. Berger made no other disbursements chargeable against the Barts' recovery in October. On October 31 his escrow balance should have been at least $18,400 ($29,000 less total fee of $10,600). On October 31 his escrow account balance was $13,670.31.

On November 2 Berger drew on the escrow account a check to himself for $2,000 which cleared on November 3. On November 4 he drew on the escrow account a check to himself for $1,800 which cleared on November 7. On November 7 he drew on the escrow account a check to himself for $2,200 which cleared that day. At the close of business on November 7, 1988, the balance in Berger's escrow account was $6,422.36, as compared to the $18,400 which, under Berger's reckoning of his fee, he should have had in escrow for the Barts' case alone.

On November 10 Berger made one disbursement chargeable to the Barts, an item of $70 for a medical bill paid to Dr. Robbins.

During this period Berger also settled a case for clients named Diener for $85,000 on which his fee was as much as $25,000. The $85,000 was deposited to the escrow on November 18, and the November ending balance of the account was $100,708.52.

On December 8, 1988, Berger disbursed $193.60 from escrow to Dr. Friedler on behalf of the Barts. Berger's December ending balance in the escrow account was $76,-808.54.

Berger testified that he had not been reconciling to bank statements on the escrow account, but that even he was surprised when he saw "at a later point in time" how low the escrow account balance had fallen in early November. Direct examination by Bar Counsel of Berger as an adverse witness then proceeded as follows:

"Q   When did you see that account balance?

"A  I noticed before the end of that year that the account was off.  Obviously, there had been errors made in dealing with the account.

"At that time, I rectified the errors by reviewing the account ledgers and making sure the account was brought up to par by maintaining the appropriate account balances.

"THE COURT: When did you make these corrections, Mr. Berger?

"THE WITNESS: Before the end of the year, Your Honor.

"THE COURT: Before the end of 1988.  On your own, you are saying?

"THE WITNESS: Yes, absolutely.

"BY [BAR COUNSEL]:

"Q  What did you do exactly?

"A  I had a number of cases that I had settled, and I realized that I had inappropriately and incorrectly deducted funds from the escrow account which I thought I was entitled to those fees.

"By the end of the year—and I believe it was the end of November or beginning of December—I had maintained sufficient funds in the escrow account by withdrawing less fee [amounts] than I was entitled to."

Later in the examination, Bar Counsel was inquiring about a case where Berger said he had inadvertently taken his fee twice, and, on discovering the error, restored the excess to escrow.

"Q  Now, in that case you did not . . . actually balance the escrow account to a T at that time, at the end of 1988, correct?

"A  The escrow account was in order.

"Q  What do you mean by 'in order'?

"A  It was balanced.  The funds that I was supposed to be holding were accounted for."

By check dated January 4, 1989, which cleared the escrow account on January 19, Berger disbursed $60,000 to the

Dieners. Berger wrote a check to himself on the escrow account for $2,000 on January 20 which cleared the account that day. Another check, of illegible date and payable to Berger in the amount of $3,000, cleared the escrow account on January 25, 1989. At the close of business on January 25, 1989, the balance in the escrow account was $14,954.66. By Berger's reckoning the amount which should have been in the escrow account for the Barts alone was at that time $18,136.40 ($29,000 − [$10,600 (legal fee) + $263.60 (medical expenses) ] ).

By February 1989 Mr. and Mrs. Bart had agreed that all of the net recovery in the accident case would be paid to her. During divorce negotiations, in a letter of October 5, 1988, to the Barts and their respective counsel, Berger had estimated that the net proceeds to be disbursed to the Barts would be $17,900. By letter of February 25, 1989, Berger sent to counsel for Mrs. Bart $15,791.40. In a longhand "[b]reakdown" at the bottom of the page, Berger explained that the $13,208.60 reduction from $29,000 consisted of $10,500 of attorney's fee and "unpaid" medicals of $2,708.60.[2]

Under the written fee agreement Berger's fee should have been no more than $9,666.66 ($29,000 ÷ 3). Berger explained that at some point after undertaking the Bart matter he had changed his usual fee arrangement and had

---

2. After Mrs. Bart had complained to Bar Counsel, when Berger attempted to reconstruct the checks which represented his fee on the Barts' case, Berger identified six checks which totaled $10,600, as reviewed above. One explanation of the discrepancy would be that, by May 1989, Berger had thrown away the tally sheet from September and October of 1988. If, as Berger told Judge Heller, he had, by the end of 1988 "rectified the errors by reviewing the account ledgers," one wonders why Berger did not review "the account ledgers" when submitting a "breakdown" to Mrs. Bart's counsel in February 1989. Another possible inference is that, if Berger were using his escrow account as a revolving loan fund or credit card, then six checks written in September and October 1988 and totaling $10,600 were as close as he could reconcile in May 1989 or later to the $10,500 figure which he used in February 1989. These are, of course, issues for the circuit court judge on remand.

begun charging forty percent of the recovery in cases where suit was instituted before settlement. He assumed that the Bart matter was subject to that arrangement. Berger further explained that, in remitting to Mrs. Bart, he had not charged forty percent because he had promised her when the accident case was settled that he would reduce his fee. The circuit court judge accepted this explanation.

After Mrs. Bart had complained to Bar Counsel, Berger refunded to her $900 of the fee charged.

Reconciliation of the $2,708.60 withheld for medical expenses in the February 1989 "breakdown" is seemingly impossible on the present record. Berger says that in June 1988, when the accident case was settled, he told Mrs. Bart that he would also try to negotiate her unpaid medical bills. As of February 25, 1989, the record before us reflects that there were $3,621.28 of medical bills paid and unpaid which could properly have been deducted from the recovery before disbursing to the client. Some of the health care providers later reduced or eliminated their charges, as per the following schedule.

| Provider | Amount Paid or Payable From Escrow at 2/25/89 | Amount of Reduction | Amount Paid | Date Paid |
|---|---|---|---|---|
| Dr. Zigel | $ 196.00 | None | $ 196.00 | 5/17/89 |
| The Bethesda Temporomandibular Joint & Facial Pain Treatment Center | $1,775.00 | $575.00 | $1,200.00 | 5/17/89 |

| Provider | Amount Paid or Payable From Escrow at 2/25/89 | Amount of Reduction | Amount Paid | Date Paid |
|---|---|---|---|---|
| Drs. Copeland et al.[3] | $ 368.00 | None | $ 368.00 | 5/17/89 |
| Dr. Kanner | $ 231.00 | None | $ 231.00 | 5/17/89 |
| Colonial Pharmacy | $ 100.00 | None | $ 100.00 | 5/17/89 |
| Dr. Robbins | $ 70.00 | None | $ 70.00 | 11/10/88 |
| Dr. Freidler | $ 193.60 | None | $ 193.60 | 12/08/88 |
| Dr. Sabatier | $ 687.68 | $687.68 | $0 | — |

Dr. Sabatier's office manager, in a letter of September 25, 1989, to Berger describes the credit to Mrs. Bart's bill as an extension of "professional courtesy." [4] The reductions by Dr. Sabatier and by the Bethesda pain center produced a credit in Mrs. Bart's favor of $350 in relation to the figure of $2,708.60 which Berger used for unpaid medical bills in the February 25, 1989, breakdown. On September 27 Berger disbursed $350 from the escrow account to Mrs. Bart.

After receiving the $15,791.40, Mrs. Bart on March 3, 1989, wrote to Berger. She referred to his earlier estimate of $17,900 as the net recovery. She said "[b]ecause I was unaware of any reason for a change in that figure, I am writing to you for a full disclosure of my settlement, and all charges pertaining to the accident." Berger did not respond. Thereafter Mrs. Bart made several attempts to speak with Berger by telephone, but she was ultimately told by Berger's secretary that her case was closed. Mrs. Bart complained to Bar Counsel who received her complaint on

**3.** Actually Mrs. Bart had paid Drs. Copeland et al. directly. They refunded the $368 paid from escrow to Mrs. Bart.

**4.** The $687.68 balance eliminated by the extension of professional courtesy included $325 for a lumbar thermogram administered on November 13, 1984.

May 1, 1989. In response to Bar Counsel's request for an explanation, Berger, on May 15, 1989, wrote that his fee would have been $11,600 "[b]ased upon the fee agreement with Mrs. Bart." The circuit judge placed heavy emphasis on this response to Bar Counsel in concluding that Berger did not intend to defraud Mrs. Bart. The thrust of Bar Counsel's exception, however, is to whether Berger was knowingly using Mrs. Bart's funds for his own purposes while they were supposed to be in escrow.

At the conclusion of the hearing in the circuit court there was a colloquy between Judge Heller and Bar Counsel. Berger's counsel quotes at length from that colloquy in his memorandum to this Court to support the position that Berger's state of mind is purely a fact issue and that Judge Heller's finding is not clearly erroneous. Berger's memorandum to us includes the following.

> "The Court: 'In other words, I want to understand. After December 1988 or November 1988, Mr. Murphy [Bar Counsel], you are not claiming that there were any shortfalls or deficits in that Escrow Account at any time, are you?
>
> "Mr. Murphy: 'Well, the level went way up beyond what he needed to cover the....'
>
> *     *     *     *     *     *
>
> "The Court: 'The question was: after he noticed for whatever reason, the low amount of monies in November 1988, and Mr. Berger's testimony was that on his own at that time, before the Complaint had been lodged against him, he corrected that.
>
> 'Without my looking through all of this documentation, is that correct; that after December 1988 there were sufficient monies in the Escrow Account to cover what had to be covered?'
>
> "Mr. Murphy: 'The answer, your Honor, is that there was. Yes, Your Honor. Yes.
>
> *     *     *     *     *     *
>
> "[THE COURT]: 'All right. Now, then, let me ask you something else. Therefore, by the time, although his

bookkeeping habits had not changed until he met up with Mr. Rosenthal and responded to counsel's inquiry, at least there was no issue past December of 1988 as to monies available in that account for clients.... that was due and owing clients; is that correct?'

"Mr. Murphy: 'Only in a sense, Your Honor, the payments with which he did pay the money had to come elsewhere than from the $29,000.00.

'Making reference to May 17, 1989, you have seen the five checks. He has already testified that as of November 10, 1988, when we see that lowest....'

"The Court: 'Well, he has already said that due to his bookkeeping, the account was out of balance. On his own, I am saying, am I correct, that before the Complaint was lodged and before there was any investigation by the Attorney Grievance Commission, he made sure that there was sufficient funds in the Escrow Account to cover not only the Bart, but any other client's monies he was holding for them? Am I correct?'

"Mr. Murphy: 'I can't speak to any other clients beyond Bart.'

"The Court: 'All right.' "

Judge Heller's report to us reflects the same understanding of the facts as revealed in colloquy with counsel. Speaking of the escrow balance at November 10, 1988, Judge Heller reports as follows:

"Mr. Berger testified he realized at that point that there was a major shortfall in the account and that he had inappropriately and incorrectly deducted fees from the escrow account. It is important to note this was *before* he was notified by anyone that something was amiss in the Bart case or *before* the Commission had received the complaint from Mrs. Bart filed in May, 1989. Mr. Berger immediately undertook to balance the escrow account and had it in balance by the end of the 1988 calendar year. Although it stayed in balance thereafter, he admitted he did not change his methods of managing the account until after consulting with Mr. Rosenthal."

In his memorandum to us, Berger's counsel argues that "Respondent located the error causing the shortfall in the

account; made good the shortfall, and thereafter kept the appropriate balances in escrow for the Bart distribution. These infractions were non-willful." Response to Exceptions and Recommendations of Bar Counsel at 8–9.

As we have seen, on January 25, 1989, after Berger had disbursed $60,000 from escrow to the Dieners, his escrow was short $3,181.74 in relation to the amount he should have had in escrow for the Barts. Both Bar Counsel and counsel for Berger presumably were unaware of the point. When pressed by Judge Heller, Bar Counsel gave a factually incorrect answer. As a result, Judge Heller's conclusion is premised on a clearly erroneous assumption of fact. Under these circumstances, it is appropriate to remand this matter to Judge Heller for further proceedings, including particularly an opportunity for Berger to address the escrow shortage of January 1989. Following those further proceedings, Judge Heller should submit a supplemental report.[5]

IT IS SO ORDERED. COSTS TO ABIDE THE RESULT.

---

**5.** In a second exception Bar Counsel contends that Judge Heller should have found that Berger violated Maryland Rule of Professional Conduct 8.4(c) by misrepresenting in October 1988 the amount of the estimated net recovery distributable to the clients. We do not find that theory pleaded in the Petition for Disciplinary Action, and we do not consider it.