614 A.2d 102

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Robert Dominick POWELL.

Misc. Docket (Subtitle BV) No. 2, Sept. Term, 1991.

Court of Appeals of Maryland.

Oct. 26, 1992.

**278**

John C. Broderick, Asst. Bar Counsel for the Atty. Grievance Com'n of Md., for petitioner.

David W. Erb, of Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and BELL, JJ.

KARWACKI, Judge.

In a petition filed with this Court on March 4, 1991, the Attorney Grievance Commission charged Robert Dominick Powell, a member of the Bars of this State, New York, and the District of Columbia, with professional misconduct. The allegations of misconduct arose out of Powell's representation of Emil P. Taxay, M.D., in a civil suit[1] relating to the dismissal of Dr. Taxay from the staff of the Jess Parrish Memorial Hospital in Titusville, Florida. For his conduct prior to January 1, 1987,[2] the petition alleged that Powell, in prosecuting the *Taxay* case, had violated Disciplinary Rules (DR) 2–106 and 5–103 by entering into an unreasonable and excessive fee agreement with his client. In addition, for his conduct subsequent to January 1, 1987, the petition alleged that Powell had violated Rules 1.3, 1.4,

---

1. *Taxay v. Jess Parrish Memorial Hospital, et al.,* No. 85–348–CIV–ORL–18 was filed, in March, 1985, in the United States District Court for the Middle District of Florida.

2. This Court, by Order dated April 15, 1986, amended Maryland Rule 1230 (Code of Professional Responsibility) and adopted the Maryland Rules of Professional Conduct, which became effective January 1, 1987, thereby replacing the Code of Professional Responsibility, along with its Canons, Ethical Considerations, and Disciplinary Rules. Therefore, for conduct prior to January 1, 1987, Powell was charged with violations of Disciplinary Rules, and for his conduct after January 1, 1987, Powell was charged with violations of numerous Rules of Professional Conduct.

1.5, 1.7(b), 1.8(a), 1.8(j), 1.15, 8.1(b), 8.4(c) of the Rules of Professional Conduct, Maryland Code (1989), §§ 10–302, 10–304, 10–306 of the Business Occupations and Professions Article, and various rules under Subtitle BU of the Maryland Rules, which govern attorney trust accounts. On August 30, 1991, Bar Counsel filed an amendment to the petition that withdrew the charges that Powell violated Md.Bus.Occ.Code Ann. §§ 10–302, 10–304, 10–306, any rules under Subtitle BU, and the current version of Maryland Rule of Professional Conduct 1.15(a).[3]

---

3. This Court, by Order dated February 29, 1988, adopted a new subtitle in the Maryland Rules, Subtitle BU, which mandates and regulates the maintenance of attorney trust accounts. The Order provided for an effective date of January 1, 1989, and that Subtitle BU would govern the conduct of attorneys from thereafter. It is undisputed that the alleged misconduct that pertains to these charges occurred prior to January 1, 1989. Similarly, Md.Bus.Occ.Code Ann. §§ 10–302, 10–304, 10–306 were enacted by the General Assembly as Ch. 3, § 1 and Ch. 632, § 3 of the Acts of 1989 and had an effective date of October 1, 1989.

In order to eliminate the allegations of misconduct based on statutes and rules, which were not in effect at the time that the alleged misconduct took place, the amended petition withdrew the charges that Powell violated Md.Bus.Occ.Code Ann. §§ 10–302, 10–304, 10–306, any rule under Subtitle BU, and the current version of Md. Rule of Professional Conduct 1.15(a). In place of the current version of Md. Rule of Professional Conduct 1.15(a), the amended petition substituted the prior version of Md. Rule of Professional Conduct 1.15(a) which was in effect from January 1, 1987, through December 31, 1988, and contained no reference to Subtitle BU of the Maryland Rules. The current version of Md. Rule of Professional Conduct 1.15(a) provides:

"A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained *pursuant to Subtitle BU of the Maryland Rules.* Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation."

The prior version of Md. Rule of Professional Conduct 1.15(a), which was substituted by Bar Counsel in the amended petition, provided in pertinent part:

"A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate

On April 9, 1991, pursuant to Md.Rule BV9(b), we ordered that the charges be transmitted to Judge Lawrence H. Rushworth of the Circuit Court for Anne Arundel County. Following numerous procedural delays,[4] a hearing on the merits of the charges was conducted on November 6 and 7, 1991, on February 18 and 20, 1992, and concluded with closing arguments on March 26, 1992. Judge Rushworth's findings of fact and conclusions of law along with a record of the proceedings were filed in this Court on May 11, 1992.

## I.

By written agreement, dated February 7, 1984, and executed February 9, 1984, Powell entered into a contingency fee agreement with Dr. Taxay to represent the physician in an action against the Jess Parrish Memorial Hospital because of his summary suspension as a member of the medical staff at the hospital. The record indicates that Powell was a close personal friend of both Dr. Taxay and his wife, Hester Taxay. The civil suit was expected to involve many complex issues and require extensive prepara-

---

account maintained *in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person."*

Thus, by amending the petition, Bar Counsel withdrew only those charges alleging that Powell had violated the rules and laws governing the maintenance of attorney trust accounts.

4. On June 6, 1991, Bar Counsel filed, and was granted, a motion extending the time for hearing the charges because the complaining witness resided in Idaho and additional time was necessary to take her testimony. On May 30, 1991, asserting that he practiced law entirely outside the jurisdiction of the State of Maryland and solely within the confines of the District of Columbia, Powell filed a motion in this Court to dismiss this disciplinary action, which was denied on June 10, 1991. On July 19, 1991, Powell's initial attorneys moved to withdraw their appearance which motion was granted by Order of this Court on July 26, 1991. Also, on July 26, 1991, this Court granted Powell's request for a continuance and ordered the case to be set for a hearing before Judge Rushworth on September 19 and 20, 1991. A second motion by Bar Counsel for an extension of time in which to conduct a hearing on the charges was granted by this Court on September 17, 1991.

tion, discovery, and travel. In fact, Powell filed an eighty-three page complaint against forty defendants in March, 1985, in the federal district court.

On January 23, 1987, Dr. Taxay died. Prior to his death, Dr. Taxay made it known to his wife and Powell that he wanted the civil suit to continue, and on March 19, 1987, his wife, as personal representative of his estate, was substituted as a party-plaintiff for Dr. Taxay. Shortly thereafter, Mrs. Taxay wrote Powell in April, 1987, and again in June, 1987, stating that she had "lost the zest for pursuing" the civil suit and directing Powell to arrange for a settlement of the case. Powell told Mrs. Taxay that it would be ill-advised to simply dismiss the action, as that might leave both the estate and her open to a countersuit.

During the fall of 1987, Powell made arrangements for an aggregate settlement in the amount of $82,500.00, with four of the five groups of defendants contributing various amounts toward that total, in return for an order of dismissal with prejudice of the civil suit.[5] The settlement checks were received by Powell over a period of time.

During the time in which he received settlement proceeds on behalf of the estate of Dr. Taxay and Mrs. Taxay, Powell maintained two bank accounts in connection with his law practice. A firm operating account was maintained at Sovran Bank, and a second account was maintained at Fund for Government Investors, Inc. Powell intended the Fund for Government Investors account to be the sole depository of settlement proceeds in the *Taxay* case. Powell received a total of nine settlement checks. The first three checks that he received were deposited into the Sovran account, and the last six checks that he received were deposited into the Fund for Government Investors account.

---

5. The fifth group of defendants would only acquiesce in a joint stipulation for dismissal and contributed no money in the settlement.

The first settlement check in the amount of $12,500.00 [6] was deposited in Powell's Sovran account on November 3, 1987. Two other checks, in the amount of $50,000.00 [7] and 2,500.00 [8], were deposited in Powell's Sovran account on November 4, 1987. The other six settlement checks received by Powell were deposited in the Fund for Government Investors account. On November 20, 1987, three of these six checks, each in the amount of $2,500.00 [9], were deposited in the Fund for Government Investors account. Two of the remaining three checks, each in the amount of $2,500.00 [10], were deposited on December 21, 1987, in the Fund for Government Investors account. The remaining settlement check in the amount of $5,000.00 was deposited on December 28, 1987, in the Fund for Government Investors account.

Prior to the initial two deposits into the Sovran account on November 3 and 4, 1987, of settlement proceeds totaling

---

**6.** This check was enclosed with a letter of October 26, 1987, to Powell from William A. Parsons, Esq., the attorney representing one group of the defendants. This check was dated October 20, 1987, made out for the amount of $12,500.00, and drawn on the account of the Comstock Insurance Company. The letter indicated that a clerical error was made and an additional $2,500.00 would be disbursed from Parson's trust account in order to satisfy the agreed upon settlement of $15,-000.00. These two checks, the $12,500.00 check and the $2,500.00 check, were deposited in Powell's Sovran account on November 3 and 4, 1987.

**7.** This settlement check accompanied a letter of October 30, 1987, to Powell from an attorney, G. Bruce Hill, representing another group of defendants. This check was dated October 21, 1987, made out for the amount of $50,000.00, and drawn on the account of the Florida Hospital Trust Fund.

**8.** *See* footnote 6.

**9.** These checks were drawn on the account of the Cigna Insurance Company.

**10.** These checks also were drawn on the account of the Cigna Insurance Company.

$65,000.00,[11] it was undisputed that the Sovran account had a balance of $2,365.52. The Sovran account ending balance was $14,420.97 on November 30, 1987, $4,762.28 on December 31, 1987, and $2,619.51 on January 29, 1988. Further, prior to the deposits into the Fund for Government Investors account on November 20, 1987, and December 21 and 28, 1987, of the remaining $17,500[12] in settlement proceeds, it was undisputed that the Fund for Government Investors account had a balance of $110.76. The ending balance of the Fund for Government Investors account was $5,910.16 on December 31, 1987, $363.79 on January 31, 1988, and $64.28 on February 29, 1988.

Following the dismissal with prejudice on March 17, 1988, of the civil suit, there were numerous telephone conversations and letters written between Powell and Mrs. Taxay pertaining to disbursement of the settlement proceeds. A chronology of the correspondence is summarized as follows.

On March 23, 1988, there was a 25–minute telephone conversation during which Powell and Mrs. Taxay discussed the settlement of the case and the disbursement of the funds. Having not heard from Powell, Mrs. Taxay, in a letter to Powell dated July 17, 1988, referenced their telephone call of March 23, 1988, in which she was told that an accounting would be forthcoming, and requested both disbursement of her money and an accounting. In a handwritten letter dated August 16, 1988,[13] Powell replied and re-

---

**11.** The total of $65,000.00 was the sum of the $12,500.00 check drawn on Comstock, the $2,500.00 check drawn on Parson's trust account, and the $50,000.00 check drawn on the Florida Hospital Trust Fund.

**12.** The total of $17,500.00 was the sum of the deposit on November 20, 1987, in the amount of $7,500.00, the deposit on December 21, 1987, in the amount of $5,000.00, and the deposit on December 28, 1987, in the amount of $5,000.00.

**13.** Powell testified, and wrote in this letter, that he received Mrs. Taxay's letter of July 17, 1988, on August 12, 1988. In June 1987, following a dispute with his landlord, Powell was forced to vacate his office space at 1750 K Street, N.W., Suite 460, Washington, D.C. 20006. Powell moved his office to 2033 M Street, N.W., Suite 703, Washing-

counted his financial, family, and health problems. In this letter, Powell referenced a letter, which contained an accounting and an unsigned promissory note, that was purportedly mailed to Mrs. Taxay on April 8, 1988, but was never received by her. Powell, reiterating his letter of April 8, 1988, that was never received, requested that payment of the amount due Mrs. Taxay from the settlement proceeds be deferred for Powell's use in the form of a personal loan.[14] Powell sent Mrs. Taxay another letter dated September 13, 1988, and enclosed a copy of his letter dated April 8, 1988, a signed promissory note, which Mrs. Taxay, in a telephone conversation occurring sometime after August 16, 1988, and before September 13, 1988, had authorized him to sign, and an accounting of the settlement proceeds.[15]

---

ton, D.C. 20036. Powell testified that his receipt on August 12, 1988, of Mrs. Taxay's letter of July 17, 1988, was the result of his change of address and inefficient postal delivery.

**14.** In the letter dated April 8, 1988, a copy of which was mailed to Mrs. Taxay in another letter dated September 13, 1988, Powell wrote to Mrs. Taxay and informed her of his desperate financial situation and his need to hold onto the money due her. In the letter he stated that in March, 1987, he was removed from the position of General Counsel for his principal client, National Business Aircraft Association, which had previously provided him with $300,000.00 to $400,-000.00 in fees each year. Powell informed her that he had exhausted his savings, borrowed $18,000.00 from his parents, taken out a second trust on his house, and cashed in his pension plan. In closing, Powell stated:

"I need to hold onto the money due you out of the settlement for a while—at least until January, 1989. In order to apply for loans, and the like, I have to show 'cash on hand in banks,' and I do not have any. I *will* repay you, if you let me borrow the amount. I can pay you interest at 10%, and I have enclosed a note, which I can sign if you agree. If you need the money, or for some other reason do not want to do it, I'll understand, and I'll still love you. Please let me know."

(emphasis in original).

**15.** Because Powell moved to a different office in the summer of 1988, his files were housed in numerous boxes. Around that time, Powell had injured his chest and back and was unable to sift through his files to locate the letter dated April 8, 1988, the unsigned promissory note and the accounting. Powell, therefore, did not include these enclo-

In a letter dated September 18, 1988, Mrs. Taxay replied to Powell's letter of September 13, 1988, and indicated that, according to the accounting he had sent, Powell had made a $400.00 error in the amount of the promissory note for the amount which she was entitled to receive from the settlement proceeds. Powell replied to this letter by letter dated November 1, 1988. In this letter, Powell recounted the health problems of his parents and enclosed a revised promissory note for the correct amount due Mrs. Taxay from the settlement proceeds.

The principal of the promissory note was due on January 2, 1989, together with interest accruing from March 1, 1988, at the annual rate of 10%. When nothing was paid to Mrs. Taxay during January 1989, she wrote two letters to Powell during February and March of 1989. Powell replied with a letter dated April 14, 1989, which recounted his continuing financial and family health problems, including the death of his only brother in April, 1989, and enclosed a check for the interest due on the promissory note. In a letter to Powell dated May 12, 1989, Mrs. Taxay indicated that Powell's check had bounced due to insufficient funds. By letter dated May 17, 1989, Powell wrote to Mrs. Taxay that the check was drawn against uncollected funds, and he believed that the check would now be paid. In this letter, Powell told Mrs. Taxay to redeposit the check, which she did. This time the check was honored. Having not heard from Powell since receipt of the letter dated May 17, 1989, Mrs.

sures with his letter of August 16, 1988, but rather, after finding them in early September, included the enclosures with his letter of September 13, 1988. Some of the delay between the August 16, 1988, correspondence and the September 13, 1988, correspondence was attributed to Mrs. Taxay's move from Montana to Idaho. Mrs. Taxay had indicated in her letter of July 17, 1988, that she was about to move from Montana to Idaho and would notify Powell of her new address. Powell's letter of August 16, 1988, was sent to Mrs. Taxay's Montana address with the hope that it would be properly forwarded. Upon receipt of a change of address card from Mrs. Taxay, Powell telephoned Mrs. Taxay. It was in this telephone conversation that Mrs. Taxay assented to lending Powell her part of the settlement proceeds and to Powell's executing the promissory note.

Taxay wrote the Attorney Grievance Commission in mid-August 1989, and initiated the process which has culminated with this opinion.[16]

## II.

After making his findings of fact, Judge Rushworth concluded that Bar Counsel had not proved by clear and convincing evidence that Powell had violated the following rules: DR 2–106, DR 5–103, or Rules 1.3, 1.4, 1.5, 1.7(b), 1.8(a), 1.8(j), 8.1(b), and 8.4(c). Judge Rushworth did conclude that the current version of Rule 1.15(a) of the Rules of Professional Conduct, several BU Rules relating to attorney trust accounts, and §§ 10–302 and 10–306 of the Bus. Occ. Article had been violated. Both Bar Counsel and Powell filed exceptions to Judge Rushworth's findings and conclusions.

Bar Counsel excepts to Judge Rushworth's conclusions that Rules 1.8(a), 8.1(b) and 8.4(c) were not violated.[17] Both Bar Counsel and Powell except to Judge Rushworth's con-

---

**16.** Following receipt of a letter from Bar Counsel, Powell wrote Mrs. Taxay a letter, dated September 25, 1989, and enclosed a check for the outstanding interest and principal on the note.

**17.** "**Rule 1.8. Conflict of Interest: Prohibited Transactions.**
(a) A lawyer, shall not enter into a business, financial or property transaction with a client unless:
(1) the transaction is fair and equitable to the client; and
(2) the client is advised to seek the advice of independent counsel in the transaction and is given a reasonable opportunity to do so.
"**Rule 8.1. Bar Admission and Disciplinary Matters.**
An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not: ...
(b) Fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.
"**Rule 8.4. Misconduct.**
It is professional misconduct for a lawyer to:
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation. . . ."

clusion that the current version of Rule 1.15(a), any Md. Rules from Subtitle BU, and Md.Bus.Occ.Code Ann. §§ 10–302 and 10–306 were violated.[18] Powell asserts that this error is "of such magnitude as to vitiate the judge's conclusion of a violation." Bar Counsel maintains, however, that a prior version of Md. Rule of Professional Conduct 1.15(a), which was substituted by Bar Counsel in the amended petition, was violated, notwithstanding Judge Rushworth's erroneous conclusion based on the current version of that Rule.

■ We initially make several observations including the precept that this Court has original and complete jurisdiction over disciplinary proceedings. *Attorney Griev. Comm'n v. Nothstein,* 300 Md. 667, 687, 480 A.2d 807, 817–18 (1984); *Bar Ass'n v. Marshall,* 269 Md. 510, 516, 307 A.2d 677, 680–81 (1973); Md.Rule BV9(b). "As this is an original proceeding filed in this Court, we [make] an independent, detailed review of the complete record with particular reference to the evidence relating to the disputed factual finding." *Marshall,* 269 Md. at 516, 307 A.2d at 680–81. *See also Bar Ass'n v. Carruth,* 271 Md. 720, 727, 319 A.2d 532, 535 (1974). Moreover, "the ultimate decision as to whether an attorney has or has not been guilty of misconduct is to be made by us...." *Attorney Grievance Comm'n v. McBurney,* 282 Md. 116, 122, 383 A.2d 58, 61–62 (1978).

■ In addition, Md.Rule BV10(d) requires Bar Counsel to prove by clear and convincing evidence the factual determinations essential to establishing its case against the attorney. *Attorney Griev. Comm'n v. Bakas,* 322 Md. 603, 606 589 A.2d 52, 53 (1991); *Attorney Griev. Comm'n v. Ezrin,* 312 Md. 603, 608, 541 A.2d 966, 968 (1988); *Marshall,* 269 Md. at 516, 307 A.2d at 681. The trial court's findings of fact are *prima facie* correct and will not be disturbed unless clearly erroneous, giving due regard to the

---

**18.** *See* footnote 3.

trial court's opportunity to assess the credibility of the witnesses. *Attorney Griev. Comm'n v. Bakas*, 323 Md. 395, 402, 593 A.2d 1087, 1091 (1991); *Marshall*, 269 Md. at 516, 307 A.2d at 680. On the other hand, an attorney in a disciplinary proceeding need only establish factual matters in defense of the attorney's position by the preponderance of evidence, including whether mitigating circumstances existed at the time of the alleged misconduct. *Bakas*, 322 Md. at 606, 589 A.2d at 53.

Inasmuch as Bar Counsel, by its amended petition, withdrew the charges that Powell violated Md.Bus.Occ.Code Ann. §§ 10–302, 10–304, 10–306, the rules under Subtitle BU and the current version of Rule 1.15(a), we sustain both parties exceptions to the trial court's conclusions that Powell violated these particular statutes and rules. Nonetheless, having charged Powell in the amended petition with violating the version of Rule 1.15(a) which was in effect between January 1, 1987 and December 31, 1988, Bar Counsel maintains that Judge Rushworth's findings support a conclusion that Powell intentionally and knowingly misappropriated client funds for which disbarment is appropriate. Powell concedes that his client's funds were misappropriated, but that such misappropriation was not known to him and was unintentional due to the undiscovered mis-deposit by his office personnel of settlement checks into his Sovran account rather than into the Fund for Government Investors account.

Powell explained his theory of the undiscovered mis-deposit as follows:

Powell claimed that all three checks, which were deposited in the Sovran account on November 3 and 4, 1987 [19], were mis-deposited by his secretary, who at that time was a temporary employee hired from a temporary secretarial service agency. Powell claimed he filled out a deposit slip for the Fund for Government Investors for the $12,500.00 check drawn on Comstock's account and gave it to his

---

**19.** *See* footnotes 6–8.

secretary with instructions to deposit the check in that account. The undisputed evidence shows that this check was deposited in the Sovran account, the firm's operating account, on November 3, 1987, by use of a deposit slip for the Sovran account. Powell claimed that he failed to notice this mis-deposit for two reasons. First, he confused the name of the drawer, Comstock, with ComScope, another client of his at that time. Second, the letter, in which the check from Comstock was enclosed, referred to the check as being drawn on the Freemont Indemnity Company rather than Comstock. Powell similarly claimed his office personnel again mis-deposited the other two checks, totalling $52,500.00 in settlement proceeds, in the Sovran account on November 4, 1987.

Powell maintained that, shortly thereafter, he realized that $52,500.00 of the settlement proceeds were mis-deposited in the Sovran account. Powell then determined by rough calculation that the attorney fees and unpaid expenses far exceeded the mis-deposited $52,500.00. Also by rough calculation, Powell determined that Mrs. Taxay was due approximately $12,000.00 from the $82,500.00 settlement.[20]

Powell, thereafter, deposited the remaining settlement checks in the Fund for Government Investors account on November 20, 1987, and December 21 and 28, 1987. By the end of 1987, Powell believed he had placed $30,000.00 of the settlement proceeds in the Fund for Government Investors account.

Following the formal dismissal of the *Taxay* case on March 17, 1988, Powell and Mrs. Taxay discussed the dismissal of the case and distribution of the proceeds in a telephone conversation on March 23, 1988. Some two weeks later Powell mailed a letter dated April 8, 1988,

---

**20.** The contingency fee agreement had an expense cap of $50,000.00. The trial court expressly found that, in light of the complex nature of the litigation and the possibility of a multi-million dollar award, the fee agreement was fair and reasonable. Bar Counsel took no exception to this finding and we express no opinion on this type of agreement.

which enclosed an accounting, an expense itemization and an unsigned promissory note. This letter requested a loan from Mrs. Taxay of her share of the settlement proceeds and included the promissory note for her inspection. *See* footnote 14. The promissory note was in the amount of $12,242.52 which Powell had calculated to be the amount owed to Mrs. Taxay. She never received this letter and in July, 1988, wrote to Powell requesting her money and an accounting.

At the time he requested the loan from Mrs. Taxay in his letter dated April 8, 1988, Powell claimed he had no knowledge that the $12,500.00 was mis-deposited in the Sovran account. Further, Powell claimed that he had not received, or if received, had not reviewed any of the statements of the account from the Fund for Government Investors prior to seeking the loan from Mrs. Taxay. Consequently, at the time he wrote the letter dated April 8, 1988, Powell claimed to have no knowledge of the fact that he had already depleted that money. Bar Counsel claimed that the copy of the letter dated April 8, 1988, was prepared and mailed to Mrs. Taxay long after April 8, and was a sham to cover Powell's defalcations.

After several letters were exchanged between Powell and Mrs. Taxay during the summer of 1988, Powell claimed that Mrs. Taxay, in a telephone conversation occurring between August 16, 1988, and September 13, 1988, assented to lending her settlement proceeds to him. Whereupon, Powell mailed to Mrs. Taxay a letter dated September 13, 1988, and enclosed a copy of his letter of April 8, 1988, and the signed promissory note, which represented the loan. Powell claimed that only after Mrs. Taxay assented to the loan and he sought to remove the $12,500.00 from the Fund for Government Investors account, did he realize that the funds had been misappropriated. Powell claimed he was shocked to realize at that time that the money was not in the Fund for Government Investors account. Powell then tried to rectify the misappropriation that occurred as a result of the undiscovered mis-deposit nearly one year earlier. After he

became aware of the misappropriation, Powell established a separate account at Crestar Bank, and into which, he deposited $18,000.00 on October 27, 1988.[21] Powell claimed that he repaid Mrs. Taxay on September 25, 1989, not in response to Bar Counsel's letter of August 28, 1989, which indicated that Mrs. Taxay had filed a complaint against him, but rather he repaid Mrs. Taxay on the day funds were made available to him from a loan approved in mid-September, 1989, by the Household Finance Corporation.

Powell suggests that the misappropriation was the result of negligently supervising his office personnel similar to that found in *Attorney Griev. Comm'n v. Dacy*, 313 Md. 1, 542 A.2d 841 (1988) and *Attorney Griev. Comm'n v. Goldberg*, 292 Md. 650, 441 A.2d 338 (1982), for which a reprimand or a short suspension is all that is required.

Bar Counsel views Powell's conduct in a very different light. Bar Counsel claims that Powell failed to deposit Mrs. Taxay's funds in a separate account in violation of Rule 1.15(a). Bar Counsel claims that Powell then misappropriated Mrs. Taxay's share of the settlement proceeds, by dissipating all of the settlement funds by February, 1988, in violation of Rule 1.15. Bar Counsel claims that Powell then engaged in a sham transaction, by requesting a loan from Mrs. Taxay of her share of the settlement proceeds after knowingly misappropriating the funds, in violation of Rule 8.4(c). Bar Counsel asserts that Powell's conduct is similar to that found in *Attorney Griev. Comm'n v. Boehm*, 293 Md. 476, 446 A.2d 52 (1982) and *Attorney Griev. Comm'n v. Pattison*, 292 Md. 599, 441 A.2d 328 (1982) for which disbarment is appropriate. We do not agree with either Bar Counsel's or Powell's characterization of the misappropriation.

---

**21.** Unfortunately, the record only contains statements of this Crestar account for November of 1988 through January 9, 1989. It is unclear what became of this $18,000.00 following that date or why Mrs. Taxay was not paid with this money.

■ As this Court has stated all too often, "[m]isappropriation of funds by an attorney involves moral turpitude; it is an act infected with deceit and dishonesty and will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." *Attorney Griev. Comm'n v. Ezrin*, 312 Md. 603, 608–09, 541 A.2d 966, 969 (1988). *See also Attorney Griev. Comm'n v. Lazerow*, 320 Md. 507, 578 A.2d 779 (1990); *Attorney Griev. Comm'n v. Boehm*, 293 Md. 476, 446 A.2d 52 (1982); *Attorney Griev. Comm'n v. Pattison*, 292 Md. 599, 441 A.2d 328 (1982); *Attorney Griev. Comm'n v. Burka*, 292 Md. 221, 438 A.2d 514 (1981); *Attorney Griev. Comm'n v. McBurney*, 282 Md. 116, 383 A.2d 58 (1974); *Bar Ass'n v. Marshall*, 269 Md. 510, 307 A.2d 677 (1973).

■ Judge Rushworth made a finding that is dispositive of Bar Counsel's characterization of the misappropriation, unless of course, it is clearly erroneous. Judge Rushworth expressly found that "[a]lthough there was ample evidence of disorganization and inefficiency in his practice, there was no clear and convincing evidence of 'dishonesty, fraud, deceit, or misrepresentation' on the part of Powell in dealings with his client Hester Taxay." This Court has often stated that "[i]t is elementary that a trier of fact may elect to pick and choose which evidence [or story] to rely upon." *Attorney Griev. Comm'n v. Nothstein*, 300 Md. 667, 684, 480 A.2d 807, 816 (1984). It is clear that Judge Rushworth, by making this finding, believed Powell's theory regarding the undiscovered mis-deposit. The record sufficiently supports this finding, and therefore, it is not clearly erroneous. Consequently, Bar Counsel's exception to the trial court's failure to find a violation of Rule 8.4(c) is overruled.

Although Powell did not intentionally misappropriate Mrs. Taxay's funds, we do not accept Powell's characterization of the misappropriation as being similar to that which occurred in *Goldberg* and *Dacy, supra.* In *Goldberg,* an attorney failed to adequately supervise his office manager, who negligently performed her duties. 292 Md. at 651–53, 441 A.2d at 339–40. As a result, the attorney's escrow

account became overdrawn. 292 Md. at 656, 441 A.2d at 341. In *Goldberg,* the Court summarized the facts which led to the misappropriation:

"There came a time while in the employment of Mr. Goldberg that [his office manager,] Mrs. Ofterdinger[,] failed to prepare the necessary pleadings, documents or papers required to be done. As she got increasingly behind, she would remove the files and not calendar them, preventing the lack of progress on those files from coming to the attention of Mr. Goldberg. In order to cover her inactivity on these files, Mrs. Ofterdinger then started going through all of the office mail, removing any letters that had reference to the work that had not been done. She also removed any phone messages and intercepted calls to Mr. Goldberg. She made excuses or misrepresentations as to why the work had not been done in some instances and falsely represented that the work had been done in others. Checks received from clients were not deposited in the appropriate account, and from the exhibits it would appear that unauthorized checks were drawn by Mrs. Ofterdinger for improper purposes. She further intercepted the letters from the Attorney Grievance Commission."

292 Md. at 652, 441 A.2d at 339. In *Dacy, supra,* an attorney failed to properly instruct an employee on arrangements she was to make with a savings and loan association that the attorney represented in real estate settlement matters. 313 Md. at 2, 542 A.2d at 841. As a result, the employee set up a firm operating account through which monies destined for the attorney's escrow account would pass. *Id.* at 2–3, 542 A.2d at 841–42.

A review of the record in this case demonstrates that *Goldberg* and *Dacy* are inapposite. In his deposition, Powell testified that he did not always receive his bank statements for the Sovran account and the Fund for Government Investors account. When questioned as to why he failed to discover the mis-deposit and lack of funds in the Fund for Government Investors account, Powell stated that he did

not check his bank statements; "[he simply] did not pay any attention to that account." Powell testified that he maintained in his head what money was owed to Mrs. Taxay and where it was located. In his deposition, Powell acknowledged he was wrong not to make sure the money was in the Fund for Government Investors account.

At the hearing in front of the Inquiry Panel, Powell testified that he rarely is in his office and travels throughout the country on an average of two to three days a week. We find the following colloquy very instructive on characterizing Powell's misappropriation:

"[MR. POWELL]: So, when checks come in and things come into the office, no matter who they are from, I usually ask my secretary to deposit them. Now, sometimes they put the damned things in the wrong accounts.

"MR. MURPHY: Well, what did you then do at that time, what was your method for double-checking to make sure that checks of that nature were put into the right account? This is after the fact.

"MR. POWELL: My secretary is required to give me the deposit slips and I would remove the money if it were in the wrong account and place it where it is supposed to be. I don't recall doing it in this case.

"MR. MURPHY: But you're saying that your practice at the time, in '87 and in '88 and today and all the time in between, was to be very careful to make sure that your secretary put funds in the proper accounts?

"MR. POWELL: No, I didn't say that. What I would do is, I would give them instructions to put the money into specific accounts. And I have to admit to you that I was not employing the brightest of all people during this period of time.

"MR. MURPHY: And so, knowing that

"MR. POWELL: Lots of time they would make mistakes and when I came back from wherever I was, I would go through my IN box and the deposit slips would be there and if I found that a deposit had been erroneously made, I would transfer the money."

■ What distinguishes this case from *Goldberg* and *Dacy*, is that, unlike the attorneys in those cases, Powell was on notice as to the probability that Mrs. Taxay's funds may be mis-deposited. We find Powell's conduct similar to the attorneys' conduct in *Attorney Griev. Comm'n v. Berger*, 326 Md. 129, 604 A.2d 58 (1992) and *Attorney Griev. Comm'n v. Kramer*, 325 Md. 39, 599 A.2d 100 (1991). In both *Berger* and *Kramer*, neither attorney intentionally misappropriated client funds, but both attorneys were found to have been grossly negligent in misappropriating their clients' funds.

In *Berger*, the attorney failed to maintain individual client ledgers or even a general client ledger. 323 Md. 428, 431, 593 A.2d 1103, 1105 (1991). The only evidence of any accounting "control" by Berger was his testimony that he kept at his desk a tally sheet on which he recorded the fees earned that were in his escrow account. *Id.* From the fees recorded on his tally sheet, he subtracted the incremental withdrawals as he made them. *Id.* This Court upheld the trial court's characterization of Berger's actions as " 'gross and wanton negligence amounting to a total disdain and disregard for his duties to safeguard his client's money.' " 326 Md. at 130–31, 604 A.2d at 58.

In *Kramer*, the attorney, as a result of personal problems, abandoned his law practice and his concomitant responsibility for managing his escrow accounts. 325 Md. at 45–51, 599 A.2d at 103–06. Consequently, many of Kramer's records of his escrow account disappeared and those he kept were woefully deficient. *Id.* at 49–51, 599 A.2d at 105–06. This Court characterized Kramer's conduct as gross negligence. *Id.* at 51, 599 A.2d at 106–07. Even if we conclude that Powell's conduct did not rise to the level of gross negligence, to repeat this Court's words from another misappropriation case, *Attorney Griev. Comm'n v. Owrutsky*, 322 Md. 334, 355, 587 A.2d 511, 521 (1991), Powell's conduct is "perilously close" to gross negligence and more culpable than the conduct in *Goldberg* and *Dacy, supra.* Powell's exception to the contrary is overruled.

## III.

■ Bar counsel also maintains that, even if the money was not knowingly misappropriated and the loan was not a sham, then the loan resulted in an improper conflict of interest in violation of Rule 1.8(a). The trial court made two findings relating to Powell's use of Mrs. Taxay's share of the settlement as a loan. First, the trial court found that the loan "was a fair and equitable personal loan to a close friend." Second, the trial court expressly found that Mrs. Taxay assented to Powell's use of her share of the settlement proceeds as a personal loan when she wrote Powell, in a letter dated September 18, 1988, requesting a note in the correct amount.[22]

Bar Counsel asserts that Mrs. Taxay was not advised to seek the advice of independent counsel and given the opportunity to do so. Moreover, Bar Counsel asserts that Mrs. Taxay did not assent to the loan, but rather, acquiesced to the loan out of sheer frustration over Powell's failure to identify and disburse her share of the settlement. Mrs. Taxay did not testify in the hearing before Judge Rushworth, but Bar Counsel uses her testimony before the Inquiry Panel and at her deposition in support of its position.

Before the Inquiry Panel and at her deposition, Mrs. Taxay testified that the first time she knew of the loan request was when she received the signed promissory note, which was made out in the wrong amount, in the mail. Moreover, she testified that if she had the opportunity to refuse the loan, she would have done so.

---

**22.** Powell testified repeatedly that there was a telephone conversation with Mrs. Taxay, which occurred between his letters dated August 16, 1988 and September 13, 1988, in which she assented to lending him her share of the settlement proceeds. Unfortunately, Judge Rushworth failed to make a finding regarding this testimony. Judge Rushworth seems to have based his finding that Mrs. Taxay assented to lending Powell the money solely on Mrs. Taxay's letter of September 18, 1988, requesting a note made out in the correct amount.

Throughout the proceedings, Powell testified that only after Mrs. Taxay assented to the loan by telephone did he sign the promissory note. Moreover, Powell repeatedly testified that, in this telephone conversation, he advised Mrs. Taxay to seek the advice of her attorney in Montana concerning the loan, in accordance with Rule 1.8(a)(2). This attorney in Montana was the same attorney who had handled Dr. Taxay's estate, assisted Mrs. Taxay in her execution of numerous releases from the underlying civil suit in federal district court, and been in contact with Powell on numerous occasions.

Again, it is elementary that a trier of fact may pick and choose which evidence to rely upon. *Attorney Griev. Comm'n v. Nothstein*, 300 Md. 667, 684, 480 A.2d 807, 816 (1984). It is obvious that Judge Rushworth accepted Powell's version of events. There is sufficient evidence in the record to support this finding, and therefore, it is not clearly erroneous.

Furthermore, the record discloses that the loan was made at an annual interest rate of 10%, accruing from a date prior to final dismissal of the *Taxay* case. The *Taxay* case was formally dismissed on March 17, 1988. Testifying as to why he selected March 1, 1988, as the date from which interest was to accrue, Powell stated: "Well the case closed in mid to late March. I ... am not very good at computing those things, so I didn't want to use the exact date. It didn't seem to me fair to use April 1st, so I went back rather than forward." Based on a review of the record, we cannot say that Judge Rushworth's finding that this loan was fair and equitable is clearly erroneous. Consequently, Bar Counsel's exception to the trial court's failure to find a violation of Rule 1.8(a) is overruled.[23]

---

**23.** Powell argued, in this Court and below, that this loan did not come within the scope of Rule 1.8 because he requested the loan from a friend, not a client. In his findings, Judge Rushworth implicitly found that the loan was made between friends, not between an attorney and his client. Without addressing Powell's proposition, we

## IV.

Bar Counsel's final exception is to Judge Rushworth's failure to find a violation of Rule 8.1(b). Bar Counsel complains that, prior to the Inquiry Panel hearing, his office was never advised by Powell that he had an account at the Fund for Government Investors even though he was notified by Bar Counsel that the Inquiry Panel would be considering his deposit of the funds from the settlement of the *Taxay* case. Bar Counsel further complains that, by not producing account records from the Fund for Government Investors at the Inquiry Panel hearing, Powell failed to comply with a Md.Rule BV6(d) subpoena letter requiring him to bring records of all accounts into which he placed the settlement funds. The gravamen of Bar Counsel's exception is that Powell failed to produce, at the Inquiry Panel hearing, the bank statements from the Fund for Government Investors relating to the *Taxay* settlement. On this point, the trial court stated that he could not find "clear and convincing evidence that Powell 'failed to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail[ed] to respond to a lawful demand for information'" from a disciplinary authority in accordance with Rule 8.1(b).

Powell testified that, as of the date of the Inquiry Panel hearing, he did not possess any of the relevant statements from the Fund for Government Investors account. Following the conclusion of the *Taxay* case, Mrs. Taxay authorized Powell, who was moving to a smaller office, to dispose of any records relating to that case. Powell testified that these records were, more than likely, inadvertently thrown out in the disposal of the other *Taxay* records. Powell also testified that he made a concerted effort to locate the records sought by the Inquiry Panel, including looking through all the files at his home and his office. In addition, Powell testified that he placed three telephone calls to the

only find that the record adequately supports Judge Rushworth's finding that this loan complied with Rule 1.8(a).

Fund for Government Investors in an effort to obtain copies of the desired records prior to commencement of the Inquiry Panel hearing. At the Inquiry Panel hearing, Powell produced several boxes of records from the *Taxay* case, including statements from Sovran Bank, his Sovran Bank ledger, as well as bills, notes, work sheets and itemizations of expenses from the *Taxay* case.

Bar Counsel argues that Powell "made no significant efforts to comply with [its] investigator ... or to present records he was obliged to maintain." Bar Counsel argues that Powell should have personally visited the offices of the Fund for Government Investors to request the account records.

■ The trial court found that "[w]hile less than cooperative and reasonable in his responses to Bar Counsel's investigation of the charges against him, Powell's conduct falls short of a violation of the provisions of Rule 8.1." Although we do not condone Powell's failure to visit personally the offices of the Fund for Government Investors in order to obtain the account records in response to Bar Counsel's subpoena, we cannot say the trial court's finding is clearly erroneous. Bar Counsel's exception to the trial court's failure to find a violation of Rule 8.1(b) is overruled.

## V.

Powell makes three other exceptions to the trial court's findings, each of which, we shall sustain. First, the trial court found that both bank accounts, the Sovran account and the Fund for Government Investors account, were interest bearing. The undisputed evidence shows that the Sovran account was a standard business, non-interest bearing account. The record also shows, however, that dividends were paid on the Fund for Government Investors account. Powell's exception to the finding that the Sovran account was interest bearing is sustained.

Second, the trial court found that Powell deposited the $52,500.00 directly into the Sovran account in order to avoid

a "pointless transfer" because he had determined that the entire amount was owed to him in fees and expenses for the *Taxay* case. The undisputed testimony of Powell was that the $52,500.00 was mis-deposited by his office personnel into the Sovran account. Upon realizing this mis-deposit, Powell did a rough calculation of what was owed in fees and expenses. It was only after discovering this mis-deposit that Powell determined that correcting the mistake by moving the money into the Fund for Government Investors account and then back into the operating account would be a pointless transfer. The record contains no evidence to indicate that Powell deposited the $52,500.00 directly into the Sovran account in order to avoid a pointless transfer. The trial court's contrary finding is clearly erroneous and Powell's exception is sustained.

Finally, the trial court's finding that the signed promissory note was enclosed in Powell's letter of August 16, 1988, is clearly erroneous. The record demonstrates that the first promissory note, which was made out for the wrong amount, was included in Powell's letter of September 13, 1988, following the telephone conversation in which Mrs. Taxay agreed to the loan. Powell's exception to this finding is sustained.

## VI.

In sanctioning this attorney, we repeat " 'that sanctions imposed in disciplinary proceedings against an attorney are not for the purpose of punishing the individual, but are intended as protection to the public.' " *Attorney Griev. Comm'n v. Kemp*, 303 Md. 664, 680, 496 A.2d 672, 680 (1985) (quoting *Attorney Griev. Comm'n v. Velasquez*, 301 Md. 450, 459, 483 A.2d 354, 359 (1984)). "The severity of the sanction, of course, generally depends upon the facts and circumstances of the case." *Id.* Powell unintentionally misappropriated his client's funds through conduct that, if not grossly negligent, is perilously close to gross negligence. As this Court has stated several times before, "[w]e desire that the message go out loud and clear to the

Maryland Bar and to the citizens of Maryland that we shall not tolerate attorneys' misusing their clients funds." *Attorney Griev. Comm'n v. Pattison*, 292 Md. 599, 610, 441 A.2d 328, 333 (1982); *see also Attorney Griev. Comm'n v. Velasquez*, 301 Md. at 459, 483 A.2d at 359. A portion of former Judge Digges' oft quoted opinion bears repeating:

"The relationship existing between an attorney and his client is one that of necessity requires mutual trust and confidence. It is of prime importance not only to the parties themselves, but also to lawyers as a group as well as to society in general, that there be no lessening of the degree of confidence that the public has in the fidelity, honesty and integrity of members of the profession. It has been immemorially acknowledged that at the very heart of the attorney-client relationship is the trust concept with the attorney acting as a trustee for his client in all of his undertakings for him. This is especially true in the attorney's handling of moneys of others coming into his hands. So, it is essential that all members of the legal fraternity be strongly and constantly impressed with the truism that in handling moneys and properties belonging to their clients or others that they accept them in trust and are strictly accountable for their conduct in administering that trust, so they dare not appropriate those funds and properties for their personal use. The misappropriation by an attorney of funds of others entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct."

*Bar Ass'n v. Marshall*, 269 Md. 510, 518–19, 307 A.2d 677, 682 (1973). In characterizing the misappropriation in this case, we found Powell's conduct more culpable than the attorneys in *Goldberg* and *Dacy, supra*, and closer to the attorneys' conduct sanctioned in *Berger* and *Kramer, supra*. The attorneys in both *Berger* and *Kramer* were indefinitely suspended from the practice of law with the right to reapply in not less than one year. A substantial suspension in this case is supported by *Standards for*

*Imposing Lawyer Sanctions* (1992) which the American Bar Association adopted in 1986. Standard 4.12 provides:

"Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client."

The commentary to Standard 4.13 also states:

"Suspension or disbarment as applicable under Standards 4.11 and 4.12 and the commentary thereto is appropriate for lawyers who are grossly negligent. For example, lawyers who are grossly negligent in failing to establish proper accounting procedures should be suspended; reprimand is appropriate for lawyers who fail to follow their established procedures."

We are aware that Powell has been in private practice for over twenty years and that this is the first time he has been charged with professional misconduct. We also are aware that the funds in this case are those of a single client. The record also is replete with the many personal and familial problems confronting Powell during this period of time. Yet, despite the many problems that confronted Powell, the trial court found that Powell was a more than capable attorney during this period.

After careful consideration of this matter, we have determined that a substantial suspension is called for. Accordingly, Robert Dominick Powell will be suspended indefinitely from the practice of law with the right to reapply not less than six months from the date of the filing of this opinion.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15(c) FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ROBERT DOMINICK POWELL.